RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CHRISTA GAIL PIKE,

                    *Petitioner-Appellant*,

    *v.*

GLORIA GROSS, Warden,

                    *Respondent-Appellee*.

No. 16-5854

───────────────

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:12-cv-00035—Harry S. Mattice, Jr., District Judge.

Argued:  October 17, 2018

Decided and Filed:  August 22, 2019

Before:  COOK, GRIFFIN, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Stephen A. Ferrell, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant.  Richard D. Douglas, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Stephen A. Ferrell, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant.  Jennifer L. Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

     GRIFFIN, J., delivered the opinion of the court in which COOK and STRANCH, JJ., joined.  STRANCH, J. (pp. 15–18), delivered a separate concurring opinion.

---

**OPINION**

---

GRIFFIN, Circuit Judge.

Petitioner Christa Gail Pike, a Tennessee death-row inmate, appeals the district court's denial of her petition for habeas corpus under 28 U.S.C. § 2254.  Because we conclude that the state court's determination that she is unable to establish prejudice on her claims of ineffective assistance of counsel during the penalty phase of her capital trial was not an unreasonable application of clearly established federal law, we affirm.

I.

A.

This case began with the horrific and brutal 1995 murder of Colleen Slemmer.  Pike and Slemmer were both students at the Job Corps Center in Knoxville, Tennessee at the time.  *State v. Pike*, 978 S.W.2d 904, 907–08 (Tenn. 1998).  They had a strained relationship; Pike claimed that Slemmer "had been 'trying to get [her] boyfriend' and . . . 'running her mouth' everywhere." *Id*. at 909.  These bad feelings unfortunately resulted in the following events, as the Tennessee Supreme Court explained in a detailed opinion:

> [O]n January 11, 1995, [Pike], a student at the Job Corps Center in Knoxville, told her friend Kim Iloilo, who was also a student at the facility, that she intended to kill another student, Colleen Slemmer, because she "had just felt mean that day." The next day, January 12, 1995, at approximately 8:00 p.m., Iloilo observed Pike, along with Slemmer, and two other Job Corps students, Shadolla Peterson and Tadaryl Shipp, Pike's boyfriend, walking away from the Job Corps center toward 17th Street.  At approximately 10:15 p.m., Iloilo observed Pike, Peterson, and Shipp return to the Center.  Slemmer was not with them.
>
> Later that night, Pike went to Iloilo's room and told Iloilo that she had just killed Slemmer and that she had brought back a piece of the victim's skull as a souvenir. Pike showed Iloilo the piece of skull and told her that she had cut the victim's throat six times, beaten her, and thrown asphalt at the victim's head.  Pike told Iloilo that the victim had begged "them" to stop cutting and beating her, but Pike did not stop because the victim continued to talk.  Pike told Iloilo that she had thrown a large piece of asphalt at the victim's head, and when it broke into

smaller pieces, she had thrown those at the victim as well. Pike told Iloilo that a meat cleaver had been used to cut the victim's back and a box cutter had been used to cut her throat. Finally, Pike said that a pentagram had been carved onto the victim's forehead and chest. Iloilo said that Pike was dancing in a circle, smiling, and singing "la, la, la" while she related these details about the murder. When Iloilo saw Pike at breakfast the next morning she asked Pike what she had done with the piece of the victim's skull. Pike replied that it was in her pocket and then said, "And, yes, I'm eating breakfast with it."

During a class later that morning, Pike made a similar statement to Stephanie Wilson, another Job Corps student. Pike pointed to brown spots on her shoes and said, "that ain't mud on my shoes, that's blood." Pike then pulled a napkin from her pocket and showed Wilson a piece of bone which Pike said was a piece of Slemmer's skull. Pike also told Wilson that she had slashed Slemmer's throat six times and had beaten Slemmer in the head with a rock. Pike told Wilson that the victim's blood and brains had been pouring out and that she had picked up the piece of skull when she left the scene.

*Id*. at 907–08.

None of Pike's friends or colleagues reported the crime to the police, but a University of Tennessee Grounds Department employee nonetheless found Slemmer's body on January 13. *Id*. at 908. That employee later "testified that the body was so badly beaten that he had first mistaken it for the corpse of an animal," before realizing it was a human female when he saw the victim's clothes and her exposed breast. *Id*. The investigating police quickly discovered Pike's connection to the crime and interviewed her on January 14. *Id*. at 909. Pike waived her *Miranda* rights and gave a complete statement to the police about her involvement in the murder. As recounted by the Tennessee Supreme Court:

Pike claimed that she had not planned to kill Slemmer, but she had instead planned only to fight Slemmer and let her know "to leave me the hell alone." However, Pike admitted that she had taken a box cutter and a miniature meat cleaver with her when she and the victim left the Job Corps Center. Pike said she had borrowed the miniature meat cleaver, but refused to identify the person who had loaned it to her.

According to Pike, she asked Slemmer to accompany her to the Blockbuster Music Store, and as they were walking, Pike told Slemmer that she had a bag of "weed" hidden in Tyson Park. Though Pike refused to name the other parties involved in the incident, she said the group began walking toward the [University of Tennessee] campus. Upon arriving at the steam plant on [the University of Tennessee]'s agricultural campus, Pike and Slemmer exchanged words. Pike then

began hitting Slemmer and banging Slemmer's head on her knee. Pike threw Slemmer to the ground and kicked her repeatedly. According to Pike, as she slammed Slemmer's head against the concrete, Slemmer repeatedly asked, "Why are you doing this to me?" When Slemmer threatened to report Pike so she would be terminated from the Job Corps program, Pike again repeatedly kicked Slemmer in the face and side. Slemmer lay on the ground and cried for a time and then tried to run away, but another person with Pike caught Slemmer and pushed her to the ground.

Pike and the other person, who Pike referred to as "he," held Slemmer down until she stopped struggling, then dragged her to another area where Pike cut Slemmer's stomach with the box cutter. As Slemmer "screamed and screamed," Pike recounted how she began to hear voices telling her that she had to do something to prevent Slemmer from telling on her and sending her to prison for attempted murder.

At this point Pike said she was just looking at Slemmer and "just watching her bleed." When Slemmer rolled over, stood up and tried to run away again, Pike cut Slemmer's back, "the big long cut on her back." Pike said Slemmer repeatedly tried to get up and run. Pike recounted how Slemmer bargained for her life, begging Pike to talk to her and telling Pike that if she would just let her go, she would walk back to her home in Florida without returning to the Job Corps facility for her belongings. Pike told Slemmer to "shut up" because it "was harder to hurt somebody when they're talking to you." Pike said the more Slemmer talked, the more she kicked Slemmer in the face.

Slemmer asked Pike what she was going to do to her, at which point Pike thought she heard a noise. Pike left the scene to check out the surrounding area to make sure no one was around. When she returned, Pike began cutting Slemmer across the throat. When Slemmer continued to talk and beg for her life, Pike cut Slemmer's throat several other times. Pike said that Slemmer continued to talk and tried to sit up even though her throat had been cut several times, and that Pike and the other person would push her back on the ground.

Slemmer attempted to run away again, and Pike threw a rock which hit Slemmer in the back of the head. Pike stated that "the other person" also hit Slemmer in the head with a rock. When Slemmer fell to the ground, Pike continued to hit her. Eventually Pike said she could hear Slemmer "breathing blood in and out," and she could see Slemmer "jerking," but Pike "kept hitting her and hitting her and hitting her." Pike eventually asked Slemmer, "Colleen, do you know who's doing this to you?" Slemmer's only response was groaning noises. At this point, Pike said she and the other person each grabbed one of Slemmer's feet and dragged her to an area near some trees, leaving her body on a pile of dirt and debris. They left Slemmer's clothing in the surrounding bushes. Pike said the episode lasted "for about thirty minutes to an hour." Pike admitted that she and the other person had forced the victim to remove her blouse and bra during the incident to keep Slemmer from running away. Pike also admitted that she had removed a rag from

her hair and tied it around Slemmer's mouth at one point to prevent Slemmer from talking.  Pike denied carving a pentagram in the victim's chest, but said that the other person had cut the victim on her chest.

*Id*. at 909–10.

B.

The state of Tennessee prosecuted Pike for Slemmer's murder.  At trial, much of Pike's unsuccessful defense centered on her mental health.  Dr. Eric Engum testified that he had examined Pike and, although she suffered from no symptoms of brain damage or insanity, she did suffer from "very severe borderline personality disorder" and exhibited signs of cannabis dependence and a depressive disorder.  On this basis, Dr. Engum testified that, while there was no question Pike killed Slemmer, it was his opinion that she did not act with deliberation or premeditation and simply lost control, consistent with Pike's diagnosis of borderline personality disorder.  Additionally, Dr. William Bernet, a forensic psychiatrist with a specialty in satanic rituals, testified that he reviewed Pike's statements and the medical/psychological reports prepared by the other professionals involved in the case, and concluded that though the crime had "satanic elements," it appeared more indicative of "an adolescent dabbling in Satanism."  He also discussed the phenomenon of collective aggression, in which a group of people become emotionally aroused and "the end result is that they engage in some kind of violent, extremely violent activity."  It was his opinion that Slemmer's murder was consistent with that phenomenon.

The jury convicted Pike of premeditated first-degree murder and conspiracy to commit first-degree murder under Tennessee law.  The Tennessee trial judge sentenced Pike to twenty-five years' imprisonment on the conspiracy conviction and held a sentencing hearing to allow the jury to determine whether to sentence Pike to death for the murder conviction.  Pike's attorney, William Talman, originally intended to rely solely on the testimony of Dr. Diana McCoy, a mitigation expert hired by the defense.  But shortly before the sentencing hearing, Talman switched his plan and called only Pike's aunt, father, and mother.  All three testified about Pike's difficult childhood, and her exhibition of behavioral problems throughout her adolescence.  Ultimately, the jury sentenced Pike to death by electrocution, finding that "[t]he murder was

especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," and "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." *See* Tenn. Code Ann. § 39–13–204(i)(5), (6) (listing aggravating circumstances a jury must find to sentence a person to death).

Pike appealed her convictions and sentences, but both the Tennessee Court of Criminal Appeals, *State v. Pike*, No. 03C01-CR-00408, 1997 WL 732511, at *1 (Tenn. Crim. App. 1997), and the Tennessee Supreme Court, *Pike*, 978 S.W.2d at 907, affirmed.  Pike then filed a petition for postconviction relief in the state trial court.  The postconviction court denied relief, concluding as relevant to this appeal that Pike's trial counsel was not ineffective for failing to present alternative expert testimony or additional lay testimony on compelling mitigation in her life history.  The Tennessee Court of Criminal Appeals affirmed the denial of Pike's postconviction petition.  *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *1 (Tenn. Crim. App. 2011).  The Tennessee Supreme Court denied her application for permission to appeal, *id*., and the United States Supreme Court denied certiorari, *Pike v. Tennessee*, 568 U.S. 827 (2012).

C.

This habeas petition followed.  Pike argues that her trial counsel was ineffective during the penalty phase of trial for failing to present mitigating evidence he discovered during the investigation and for failing to discover other relevant and compelling mitigating evidence, among other reasons.  The parties filed cross-motions for summary judgment, and the district court held a two-day evidentiary hearing on Pike's petition and the parties' motions.  The district court granted respondent's motion for summary judgment and dismissed Pike's habeas petition. We granted her a limited certificate of appealability, restricted to whether she received ineffective assistance of counsel during the penalty phase of her trial.

II.

"In an appeal from the denial of habeas relief, we review the district court's legal conclusions de novo and its factual findings for clear error."  *Scott v. Houk*, 760 F.3d 497, 503

(6th Cir. 2014). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we may only overturn a state conviction for an issue adjudicated on the merits if it (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented" to the state court. 28 U.S.C. § 2254(d). A claim for habeas relief based on the "unreasonable application" prong must show more than that the state court's ruling was merely incorrect—"an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). Indeed, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted).

### III.

As in all cases alleging ineffective assistance of counsel, we turn to *Strickland v. Washington*'s two-part framework: a criminal defendant claiming ineffective assistance must prove that (1) counsel's performance was objectively unreasonable, and (2) the deficient performance actually prejudiced the defense. 466 U.S. 668, 687 (1984). Because a party alleging that claim has the burden of proof on both prongs and her failure on either thwarts relief, we can address an ineffective-assistance claim in any order we choose. *See Smith v. Spisak*, 558 U.S. 139, 151 (2010) (assuming deficient performance but denying relief for lack of prejudice).

In this case, "[w]e choose to focus on the prejudice prong of the *Strickland* test because it is easier to resolve, and there can be no finding of ineffective assistance of counsel without prejudice." *Phillips v. Bradshaw*, 607 F.3d 199, 216 (6th Cir. 2010) (citation omitted). Under *Strickland*'s prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different."  466 U.S. at 694.  Put differently, Pike bears the burden of showing that a reasonable probability exists that, but for counsel's deficient performance, the jury would have selected a different sentence.  *Wong v. Belmontes*, 558 U.S. 15, 19–20 (2009) (per curiam).

Counsel's failure to either present mitigating evidence at sentencing, *Williams*, 529 U.S. at 394–96, or discover all reasonably available mitigating evidence, *Wiggins v. Smith*, 539 U.S. 510, 521–24 (2003), can support a finding of ineffective assistance.  But "the failure to present additional mitigating evidence that is 'merely cumulative' of that already presented does not rise to the level of a constitutional violation."  *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006).  "[T]he new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing."  *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005) (quoting *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005)); *see also Sears v. Upton*, 561 U.S. 945, 954 (2010) (per curiam) ("[T]here is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker . . . .").

Pike's claim really presents two separate issues.  First, she argues that her trial counsel was ineffective for failing to present the testimony of her mitigation expert, Dr. McCoy, at her sentencing hearing.  Second, she contends that counsel was ineffective for failing to discover other compelling mitigation evidence, such as Pike's organic brain damage, bipolar disorder, post-traumatic stress disorder, and lay witnesses who could have provided a more-complete picture of Pike's humanity.

A.

Turning first to Dr. McCoy, it is unclear what substantially different mitigating evidence she would have offered by way of her testimony and the "social history" that she prepared of Pike.  Dr. McCoy's social history provided an extensive examination of Pike's entire life and explained many of the life events and childhood difficulties that led her to the murder.  For example, Dr. McCoy's report notes that "[i]t ha[d] been suggested that [the boyfriend of Pike's grandmother] may have sexually abused [Pike]" as a child, though other members of Pike's family, including her father, questioned the truthfulness of that accusation.  The social history

also noted that Pike's mother had a number of boyfriends and relationships in Pike's youth, with many of the men treating Pike in an abusive or sexually inappropriate manner. But, again, Pike's accusations were met with doubt and outright opposition by members of her family. The social history also noted that Pike believed her paternal grandmother was the only person that ever loved her, was inconsolable for days after her grandmother's death, and actually attempted suicide for the first time after her grandmother passed away. In sum, the social history laid out an upbringing of substantial difficulty and strife.

While that "social history" document was certainly thorough, and we will assume for the sake of argument that Dr. McCoy would have been able to testify consistently with the evidence she accumulated and compiled therein, the jury already got much of the social history's general content during the penalty phase of the trial. Pike's mother, Carissa Hansen, testified that Pike spent much of her childhood with her paternal grandmother because neither Hansen nor her husband were ever really home. Hansen testified that she was a drug abuser and heavy drinker during Pike's childhood, which also contributed to Pike spending time with her grandmother. Hansen also testified that Pike first attempted suicide after her grandmother's death in 1988, but that Hansen had not gotten her much psychiatric or psychological help in the aftermath. At least once Hansen chose one of her husbands over Pike, sending Pike away when there was conflict between them. She also admitted to smoking marijuana both in front of and, on at least one occasion, with Pike during her teenage years. On cross-examination, Hansen testified that when Pike was twelve years old she threatened one of Hansen's boyfriends with a butcher knife and that Pike had been a troubled child for years. But Hansen did state that Pike's "troubles" were Hansen's fault, and she blamed herself for Pike's behavior.

Pike's father, Glenn Pike, also testified on her behalf. Glenn admitted rejecting Pike during her childhood and telling her that she could no longer come to his home where he lived with a new wife and family. He testified that he had picked his new wife and children over Pike and sent her away when there was conflict between them. He testified that, another time, he kicked Pike out of his home for doing poorly in school. And yet another time Glenn "rejected" Pike and even signed adoption papers to allow her to be adopted, though this was shortly before her eighteenth birthday and an adoption never came to fruition.

Pike's aunt, Carrie Ross, also testified. Ross noted that Pike's care and upbringing fell mostly on the shoulders of her paternal grandmother and that the two were inseparable. She noted that Pike's childhood home was constantly filthy to the point that Pike, as a baby, would be "crawling around through piles of dog stool all over the house." Ross also testified that Pike "was not brought up by" her mother because her mother was never at home, instead always working or choosing to be "out partying." Ross noted that, on one occasion, Ross and Hansen were out at a bar when Hansen received a phone call that Pike, then a toddler, was experiencing severe seizures that eventually required hospitalization. While Ross thought they should return home to care for Pike, Hansen was unconcerned and wanted to remain at the bar. This was merely indicative of the constant relationship between Hansen and Pike—whenever Hansen had to act in either her own interest or Pike's, Hansen always put herself first. Ross also discussed the frequency with which Pike's extended family all faced issues with substance abuse, as well as numerous family members who were either physically or verbally abusive to their children and grandchildren, including Pike.

All in all, the jury heard a clear story: Pike's childhood and upbringing were very difficult and, in some ways, explained how she became a person capable of such a brutal murder.

Pike now claims the jury should have received the more in-depth testimony on these points that Dr. McCoy could have provided, but she fails to adequately explain how Dr. McCoy's testimony would "differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Clark*, 425 F.3d at 286. Although she argues on appeal that the jury never heard that Pike's parents' inconsistency and lack of attention to her well-being caused her "out of control" behavior, that point was made multiple times at the penalty-phase hearing, with her mother even explicitly blaming herself for Pike's behavior. Thus, the evidence counsel presented to the jury encompassed the types of mitigating evidence the Supreme Court has found valuable in other cases. *See Sears*, 561 U.S. at 948 (finding relevant mitigating evidence in verbal and physical parental abuse, inappropriate parental discipline, and behavioral disorders); *Wiggins*, 539 U.S. at 534–35 (finding "powerful" mitigating evidence in the defendant's early childhood privation and abuse, an alcoholic and absentee mother, and the physical abuse the defendant experienced). And, because the jury

heard largely the same narrative as Pike now presents, the Tennessee Court of Criminal Appeals' conclusion that Pike failed to establish prejudice from Talman's decision not to call Dr. McCoy at the penalty-phase hearing, *Pike*, 2011 WL 1544207, at \*51–52, was not an unreasonable application of federal law under AEDPA. 28 U.S.C. § 2254(d).

B.

Pike next challenges Talman's failure to investigate and discover other mitigating evidence. The first evidence Pike claims Talman failed to discover was her diagnoses of bipolar disorder, organic brain damage, and post-traumatic stress disorder (PTSD). She bases this argument on her post-sentencing examination by Dr. Jonathan Pincus, who determined that she actually suffered from organic brain damage, bipolar disorder and PTSD, rather than the borderline personality disorder Dr. Engum diagnosed. Her argument fails for multiple reasons.

First, "[a]bsent a showing that trial counsel reasonably believed that [the expert] was somehow incompetent or that additional testing should have occurred, simply introducing the contrary opinion of another mental health expert during habeas review is not sufficient to demonstrate the ineffectiveness of trial counsel." *Hill v. Mitchell*, 842 F.3d 910, 944 (6th Cir. 2016) (alterations in original) (quoting *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 758 (6th Cir. 2013)). Here, Dr. Engum testified that his expert opinion, after numerous meetings with Pike and "fairly lengthy testing," was that she suffered from "very severe borderline personality disorder." And he specifically testified that he tested Pike for brain damage and his testing "unequivocally showed that she did not suffer any signs of brain damage." Dr. McCoy also testified at a postconviction hearing that she concurred in Dr. Engum's medical assessment throughout her mitigation work on Pike's case. So Talman had two separate experts tell him that the correct diagnosis was borderline personality disorder. Even assuming, for the sake of argument, that Dr. Pincus's diagnoses of organic brain damage, bipolar disorder, and PTSD are *contrary* to Dr. Engum's diagnosis of borderline personality disorder, nothing in the record shows that Talman should have reasonably believed that additional testing was necessary. *See id*.

Furthermore, it is difficult to see how this alleged failure prejudiced Pike, when the jury considered Dr. Engum's testimony that Pike suffered from borderline personality disorder. Pike does not specifically argue that the particular medical differences between borderline personality disorder, bipolar disorder, PTSD, and organic brain damage would have influenced the jury in its decision to sentence her to death. Instead, Pike argues that the presentation of evidence of bipolar disorder and organic brain damage would have been relevant to prove to the jury that Pike's moral reasoning and impulse control were impaired—two deficits typically caused by both organic brain damage and bipolar disorder. But the jury heard Dr. Engum testify that Pike "did not act with deliberation, with premeditation, but instead, acted in a manner consistent with her diagnosis, borderline personality disorder, which meant that *she basically went out of control. She basically lost any sense of what she was doing*." (Emphasis added). In other words, the jury was already well aware of a medical expert's opinion that her moral reasoning and impulse control were not present during the murder of Colleen Slemmer. We doubt that the substitution of bipolar disorder, PTSD, and organic brain damage for borderline personality disorder would have affected the jury's deliberations on this point. *See Clark*, 425 F.3d at 286; *Sears*, 561 U.S. at 954.

Pike also argues that her trial counsel was ineffective for failing to present various other lay witnesses who could have testified about their relationships with Pike, what they thought of her, and how she had described her tumultuous childhood in conversations. For example, she argues that counsel should have presented the testimony of Marshall Muse, Pike's teacher, who would have testified that he saw "flashes [of] something special" in her. Or counsel should have called an acquaintance named Onas Perry, who could have testified about her late-night talks with Pike and how Pike had described a difficult childhood and home life. But, as noted above, Pike has not persuaded us that this other testimony would have been significantly different in strength or subject matter from the testimony of Pike's mother, father, and aunt. *Clark*, 425 F.3d at 286. In sum, none of the evidence Pike now points to substantially differs from the mitigation case that was presented to the jury.

C.

Finally, our conclusion is bolstered by the aggravating evidence before the jury. *See Bobby v. Van Hook*, 558 U.S. 4, 12–13 (2009) (per curiam) (noting that the strength of the aggravating evidence against the defendant significantly diminished any effect additional mitigating evidence might have had). The jury heard evidence that Pike and her accomplices lured the victim into a lethal trap before torturing and taunting the victim until they killed her. Pike left Slemmer's body so badly beaten that the person who discovered it thought it was the corpse of an animal before realizing it was a human body. *Pike*, 978 S.W.2d at 908. The jury also heard Pike's confession in which she admitted to slashing Slemmer's throat multiple times, throwing asphalt at her head, and even keeping a piece of her skull as a souvenir. *Id.* Tennessee law allows a jury to impose a death sentence when a "murder [i]s especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," *see* Tenn. Code Ann. § 39–13–204(i)(5). This crime fits that description.[1]

It is true that "[t]he prejudice prong is satisfied if 'there is a reasonable probability that at least one juror would have struck a different balance.'" *Dickerson v. Bagley*, 453 F.3d 690, 699 (6th Cir. 2006) (quoting *Wiggins*, 539 U.S. at 537), *abrogated in part on other grounds by Bobby*, 558 U.S. at 8–9. But a fairminded jurist could conclude that there is no such probability here, where Pike's desired evidence was mostly cumulative and insufficient to overcome the heinous nature of her crime. Even were the jury to hear everything that Pike now wishes had been presented, a fairminded jurist could conclude that the sheer weight and degree of aggravation evidence before the jury outweighs the mitigation evidence raised on appeal. *Cf. Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per curiam). Thus, the state court's conclusion that Pike could not establish *Strickland* prejudice, *Pike*, 2011 WL 1544207, at *51–52, was not an unreasonable application of federal law. *See Harrington*, 562 U.S. at 101–03. In short, because

---

[1]The jury also found that death was warranted because "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." *See* Tenn. Code Ann. § 39–13–204(i)(6). Presumably, the jury came to this conclusion based upon Pike's confession that she heard "voices telling her that she had to do something to prevent Slemmer from telling on her and sending her to prison for attempted murder." *Pike*, 978 S.W.2d at 909. Pike did not refute this evidence, and this serves as another basis for the death sentence.

Pike fails to meet AEDPA's stringent requirements, *see* 28 U.S.C. § 2254(d), she is ineligible for habeas relief.

## IV.

Because Petitioner cannot establish that the Tennessee Court of Criminal Appeals' adjudication of her claims of ineffective assistance of counsel was an unreasonable application of clearly established federal law, we affirm the judgment of the district court.

-------------------

**CONCURRENCE**

-------------------

JANE B. STRANCH, Circuit Judge, concurring. I join the opinion in this case but write separately because it presents an issue with which our society must be concerned—whether 18-year-olds should be sentenced to death. Had she been 17 rather than 18 at the time of her crime, like her codefendant Tadaryl Shipp, Christa Pike would not be eligible for the death penalty.

The difficulty of this case is not just age; the gravest concern arises from the combination of Pike's youth and the nature of her crime. Capital cases involve heinous and inexplicable crimes, and Pike's case presents no exception. But in sentencing Pike to death, we rule out the possibility that her crime was a product of the immature mind of youth rather than fixed depravity. And we presume that she is incapable of reform even though the stories of other teenage killers, many of whom have been rehabilitated behind bars, reveal other possibilities.[1]

-------------------

[1]A few examples of teenagers initially sentenced to life in prison help explain the point.

Andrew Hundley was 15 years old when he killed a 14-year-old girl "whose body was found burned and badly beaten behind a grocery store." Grace Toohey, *The Power of Second Chances: How this 37-year-old, Once in Prison, Is Now an LSU Grad*, The Advocate, May 10, 2019, https://www.theadvocate.com/baton_rouge/news/crime_police/article_03c590ae-72a9-11e9-8d2b-4b78d19fcd5b html. Now 37, Hundley helped found the Louisiana Parole Project and completed college coursework while in prison; he finished his bachelor's degree in sociology after being released on parole and plans to pursue a master's degree in criminology. *Id.*

Bosie Smith was 16 when he stabbed another youth to death after an argument. Ted Roelofs, *In Prison for Decades, One Juvenile Lifer's Quest for Redemption*, Bridge Magazine, Aug. 26, 2016, https://www.mlive.com/politics/2016/08/in_prison_for_decades_one_juve.html. Once in prison, Smith took advantage of every rehabilitative program available to him, training Greyhounds so that they can be adopted by families and winning the warden's support for his release. *Id.*

When he was 16 years old, Kempis Songster stabbed another teenage runaway to death; after nearly three decades in prison, he "is training to be a yoga instructor, leading workshops in cultural awareness, studying philosophy and history . . . . He is doing everything, anything, really, to better himself, create a persona separate from his crime and crushing sentence. He wants to make amends." Amy S. Rosenberg, *Teen Killers, Prison Lifers, Given a Ray of Hope*, Philadelphia Inquirer, Feb. 7, 2016, https://www.inquirer.com/news/inq/teen-killers-prison-lifers-given-ray-hope-20160206 html.

Amaury Rosario was 17 when he, along with his codefendants, shot and killed four unarmed people during a robbery gone wrong. *United States v. Rosario*, 99-cr-533, 12-cv-3432, 2018 WL 3785095, at *2 (E.D.N.Y. Aug. 9, 2018). After two decades in prison, guards as well as inmates attested to his character and positive influence; moreover, mental-health experts working for both the defense and the prosecution at his resentencing agreed that "he had been rehabilitated and . . . no longer poses a significant risk to the public." *Id.* at *4.

The judgment that she merits the most severe punishment is in tension with Supreme Court precedent focusing on the lesser blameworthiness and greater prospect for reform that is characteristic of youth.

In a series of cases starting with *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court made clear that children are different from adults for purposes of the Eighth Amendment. First, in *Roper*, the Court held that the Eighth Amendment's "evolving standards of decency" prohibit the imposition of death sentences on those who were under 18 at the time of their crimes. *Id.* at 561, 571. Next, in *Graham v. Florida*, the Court concluded that juvenile offenders who commit non-homicide offenses could not constitutionally be sentenced to life without parole. 560 U.S. 48, 74–75 (2010). Then, in *Miller v. Alabama*, the Court determined that even juvenile homicide offenders could be sentenced to life without parole only after an individualized sentencing hearing and a finding that their crime was not the product of "unfortunate yet transient immaturity." 567 U.S. 460, 479–80 (2012). Finally, in *Montgomery v. Louisiana*, the Court held that *Miller* was retroactively applicable because it announced a new substantive rule—namely, "that sentencing a child to life without parole is excessive for all but 'the rare juvenile offender whose crime reflects irreparable corruption.'" 136 S. Ct. 718, 734 (2016) (quoting *Miller*, 567 U.S. at 479–80). Taken as a whole, these cases stand for the principle that "[b]ecause juveniles have diminished culpability and greater prospects for reform . . . , 'they are less deserving of the most severe punishments.'" *Miller*, 567 U.S. at 471 (quoting *Graham*, 560 U.S. at 68).

This line of cases relied on three findings about the "significant gaps between juveniles and adults" that make children "constitutionally different from adults for purposes of sentencing." *Id.* "First, children have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking. Second, children 'are more vulnerable . . . to negative influences and outside pressures' . . . . And third, a child's character is not as 'well formed' as an adult's . . . ." *Id.* (quoting *Roper*, 543 U.S. at 569–70). These conclusions "rested not only on common sense . . . but on science and social science as well." *Id.*; *see also id.* at 472 n.5 ("The evidence presented to us in [*Miller*] indicates that the

science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger.").

Recent research in neuroscience and developmental psychology indicates that individuals between the ages of 18 and 21 share many of these same characteristics. Since *Roper* was decided, scientists have established that "biological and psychological development continues into the early twenties." Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 642 (2016). Brain-imaging studies "have shown continued regional development of the prefrontal cortex, implicated in judgment and self-control[,] beyond the teen years and into the twenties." Alexandra O. Cohen et al., *When Does a Juvenile Become an Adult?*, 88 Temp. L. Rev. 769, 783 & n.63 (2016) (collecting articles). Researchers have found that in "negative emotional situations," such as conditions of threat, young adults between the ages of 18 and 21 perform significantly worse than adults in their mid-20s—and more like those under 18. Alexandra O. Cohen et al., *When Is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 27 Psychol. Sci. 549, 559–60 (2016). "It is also well established that young adults, like teenagers, engage in risky behavior, such as . . . criminal activity, to a greater extent than older adults." Scott et al., *supra*, at 642. In short, empirical research has found that "[a]lthough eighteen to twenty-one-year-olds are in some ways similar to individuals in their midtwenties, in other ways, young adults are more like adolescents in their behavior, psychological functioning, and brain development." *Id.* at 646.

Reflecting a long-held societal understanding of this point, we already recognize 21 as the age of majority in a number of contexts. Individuals are required to be 21 to consume alcohol or marijuana (where legal), purchase tobacco in many jurisdictions, or to rent a car. Similarly, federal law prohibits licensed gun dealers from selling handguns and ammunition to those under 21, *see* 18 U.S.C. § 922(b)(1), (c)(1), while immigration law allows U.S. citizens to request immigrant visas for unmarried children under the age of 21, *see* 8 U.S.C. §§ 1101(b)(1), 1151(b)(2)(A)(i). In fact, 21 has traditionally marked the ascension to full adulthood: "[T]he term 'minor' or 'infant'—as those terms were historically understood—applied to persons under the age of 21 . . . . The age of majority at common law was 21, and it was not until the 1970s

that States enacted legislation to lower the age of majority to 18." *NRA v. ATF*, 700 F.3d 185, 201 (5th Cir. 2012).

For these reasons, I believe that society's evolving standards of decency likely do not permit the execution of individuals who were under 21 at the time of their offense. But, because we review this case under the strictures of AEDPA, we may grant Pike relief only if the state court's adjudication of her case was either (1) contrary to or unreasonably applied Supreme Court precedent, or (2) "resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). And the Supreme Court has not extended *Roper* to 18-year-olds. I therefore reluctantly concur because I agree that the state court's decision denying Pike's postconviction petition did not unreasonably apply *Strickland*'s prejudice prong.