RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JAMES MAMMONE,

         *Petitioner-Appellant,*

   *v.*

CHARLOTTE JENKINS, Warden,

         *Respondent-Appellee.*

>  No. 20-3069

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:16-cv-00900—James G. Carr, District Judge.

Argued: July 19, 2022

Decided and Filed: September 21, 2022

Before: GIBBONS, ROGERS, and READLER, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:** Vicki Ruth Adams Werneke, Office of the Federal Public Defender, Cleveland, Ohio, for Appellant. Jerri L. Fosnaught, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Vicki Ruth Adams Werneke, Sharon A. Hicks, Office of the Federal Public Defender, Cleveland, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

─────────────

## OPINION

─────────────

JULIA SMITH GIBBONS, Circuit Judge. James Mammone, a death-row prisoner in Ohio, appeals the denial of his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Mammone raises four issues on appeal: whether pretrial publicity was so prejudicial that

he did not receive a fair trial; whether the jurors unconstitutionally prayed before penalty-phase deliberations; whether trial counsel was ineffective; and whether appellate counsel was ineffective. For the reasons set forth below, we affirm the denial of habeas relief.

# I. BACKGROUND

Because this case does not turn on factual disputes, we rely on the following account of the facts from the Ohio Supreme Court's decision:

## A. The State's Evidence

### 1. Testimony of Marcia Eakin and Other Witnesses

Mammone's trial began on January 11, 2010. The state called Mammone's ex-wife, Marcia Eakin, to testify. Marcia testified about the breakdown of her relationship with Mammone and stated that she first told Mammone in August 2007 that she intended to leave him. On that day, Mammone stayed home from work and refused to let her or their two children, Macy and James IV, leave the family's Canton residence. Mammone broke Marcia's cell phone and took all the house phones. She did not leave him that day.

Marcia and Mammone sought counseling, but she did not feel that the marital relationship improved. She testified that Mammone threatened her, warning that "if I tried to leave he would kill me and the children." Unbeknownst to Mammone, Marcia contacted a lawyer to initiate the process of filing for divorce.

On June 13, 2008, Mammone learned that Marcia was seeking a divorce when he intercepted a call from Marcia's lawyer. According to Marcia, Mammone again threatened to kill her, declaring: "I told you if you tried to leave me I was going to kill you." He told Macy and James on that date that "it was time for mommy to go to her grave." Mammone did not let Marcia or the children out of his sight for the rest of the day.

Marcia explained that she and the children managed to get away from Mammone, and she sought a civil protection order against him. On July 10, 2008, the Stark County Common Pleas Court issued a two-year protection order requiring Mammone to stay more than 500 feet away from Marcia. He was permitted only supervised contact with the children.

Marcia testified that the Mammones' divorce was finalized in April 2009. Under the final divorce decree, Mammone was permitted overnight visitation with the children four times a month and evening visitation twice a week. Marcia explained that Mammone picked up and dropped off the children at the home of

her parents, Margaret and Jim Eakin, so that Mammone would not have direct contact with Marcia or know where she lived. During visits, Mammone was permitted to text Marcia about matters pertaining to the children.

Marcia testified that on Sunday, June 7, 2009, Mammone picked up five-year-old Macy and three-year-old James at the Eakins' home for a scheduled overnight visit. Mammone was driving his green BMW.

Marcia met a friend, Ben Carter, to play tennis and have dinner. At 4:25 p.m., Mammone began to text Marcia. Although the two never spoke that night, they exchanged dozens of text messages over the next 15 hours, and records of these messages were introduced at trial.

At first, Mammone sought advice about consoling Macy, who was upset. But he quickly shifted to blaming Marcia for the children's suffering, texting: "How long are we going to let these children that you * * * had to have suffer?" Throughout the evening Mammone repeatedly texted Marcia, accusing her of "ruin[ing] lives" by putting herself first. He admonished her to put her children first and demanded to know what was more important than the kids at that moment. Marcia replied by texting that Mammone should "stop tormenting" the children. No fewer than five times, she offered to have Mammone return the children to her mother's house or asked if she could meet him to pick up the children.

Mammone advised Marcia in a text that he was "at [the] point of no return" and that he "refuse[d] to let gov restrict my right as a man to fight for the family you promised me." At 9:11 p.m., he warned Marcia that "safe and good do not apply to this night my love." Marcia promptly responded, texting: "Do not hurt them." At 9:35 p.m., she asked him to "[k]eep them safe." Mammone texted:

> You got five minutes to call me back on the phone. I am not fucking around. I have stashed a bunch of pain killers for this nigh[t] * * * i hope u would never let happen. I have put on my wedding band, my fav shirt and I am ready to die for my love tonight. I am high as a kite * * * bring o[n] the hail of bullets if need be.

At this point, Marcia called 9–1–1. The state played a recording of the call at trial. On the recording, Marcia advised the 9–1–1 operator that her children were in a car with her ex-husband, who had threatened to take "a bunch of painkillers" and had said that he was "ready to die tonight." While Marcia was on the line with the 9–1–1 operator, the operator attempted to call Mammone, but he would not answer his phone. After speaking to the 9–1–1 operator, Marcia texted Mammone that she would not call him (in accordance with the operator's advice), and again urged him to "keep the kids safe." At 10:18 p.m., Marcia in a text to Mammone asked him to meet her so that she could pick up the kids. Marcia's friend Carter confirmed that he and Marcia then drove around looking for Mammone.

Marcia testified that she then contacted both Mammone's mother and the wife of Richard Hull, Mammone's friend and former employer. Phone records indicate that Richard Hull began to text Mammone, advising him to calm down and keep the kids safe. Hull's texts suggested that Mammone should drop the kids off with Mammone's mother. Hull testified that he and his father also drove around for a time looking for Mammone but did not find him.

At 2:00 a.m. on June 8, Mammone sent a text to Marcia, stating, "I am not one who accepts divorce. * * * I married you for love and for life * * *." At 2:36 a.m., he wrote, "I am so dead inside without u. The children r painful * * * [r]eminders of what I have lost of myself. This situation is beyond tolerable. So what happens next?" At 2:50 a.m., Mammone reiterated in a text to Marcia that the love of his children was "only a source of pain" without her love.

Hull testified that around 3:00 a.m., he spoke to Marcia and decided not to go back out looking for Mammone because they were hopeful that everything would be fine. Marcia attempted to end her text conversation with Mammone, writing, "Please[ ] keep kids safe good night."

At 5:34 a.m., Mammone texted Marcia: "Last chance. Here it goes."

One of the Eakins' neighbors, Edward Roth, testified that around 5:30 a.m., he heard gunshots and screaming through his open bedroom window. Roth said that he saw a goldish-tan-colored car leaving the Eakin residence and several minutes later saw the same car returning to the street to sit in the middle of the intersection near the house. Roth called 9–1–1. A law-enforcement officer testified that he and another officer arrived to find Margaret Eakin lying severely injured on the floor of a second-floor bedroom. The officers observed two shell casings and a broken lamp.

Marcia testified that she heard a car roar up her driveway around 5:40 a.m. From a second-floor bedroom window, she saw Mammone get out of the car and empty a red gasoline container onto Carter's truck, which was parked in the driveway. She called 9–1–1, and a recording of the call was introduced at trial by the state. While Marcia was on the phone, she "heard the glass in my back door breaking in and he was inside my apartment." She did not hear Mammone speak, but she heard something that he had thrown hit the ceiling. He then went back outside and threw things at the windows. Mammone left before two deputy sheriffs arrived. According to the deputies, the back door had been forced open, the screen-door glass was broken, and pieces of the door frame were on the kitchen floor.

The deputies quickly realized that the incident at Marcia's apartment was linked to the incident at the Eakins' residence, but law-enforcement officers had not yet located Mammone, and they did not know whether the children were safe.

At 6:04 a.m., Mammone left a voice mail on Hull's phone, in which the jury heard Mammone confess to Hull, "I killed the kids." Mammone's voice mail continued:

> I said it when I got locked up fucking 358 days ago that she fucking has to die and unfortunately as fucking sick as it sounds I concluded after a while that she took my family from me and the fucking way to really get her is to take fucking her mom and her kids from her. I missed her dad by a couple minutes. I drove by the house, he was there, and I fucking circled the block and he must've just pulled out or I'd have fucking popped his fucking ass too.

2. Testimony of Officers

Sergeant Eric Risner testified that he and other officers apprehended Mammone sometime after 7:30 a.m. on June 8, 2009, in the driveway of his residence. They found Macy and James dead in the back seat of Mammone's car, still strapped into their car seats. The children had apparently been stabbed in the throat.

Officer Randy Weirich testified that he removed two items from Mammone's car at the scene: a bloody knife from the back seat and a firearm from the front seat. The firearm had a live round in the chamber, its hammer was cocked, and the safety was off.

After the vehicle was towed for processing, Officer Weirich cataloged the rest of the car's contents. The evidence log includes ammunition for a .32–caliber gun; a backpack containing knives, heavy-duty shears, and tongs; an axe handle with nails protruding from holes that had been drilled into it; a baseball bat; a military-style bayonet; Mammone's cell phone and a spare battery; a framed wedding photo of Marcia; and Marcia's dried wedding bouquet. Officer Weirich also removed from the car a switchblade and a pocket knife.

3. Mammone's Confession

Mammone was arrested and transported to police headquarters. Once in custody, he signed a written waiver of his *Miranda* rights and gave a full confession. The state introduced an audio recording of the confession at trial.

In his confession, Mammone explained that he had picked up Macy and James for visitation at about 4:00 p.m. on June 7. He then drove past Marcia's nearby apartment. (Mammone admitted that he was not supposed to know where Marcia lived, but he had learned her new address and occasionally stalked her.) He saw a truck parked in Marcia's driveway, and he recognized it because it had been parked there two weeks earlier. Macy told him that the truck belonged to a boy.

Mammone explained that this news "didn't make me very happy obviously." He circled the block, and the truck was gone when he drove by again.

Mammone stated that he suspected that Marcia was on a date, so he went "on the hunt" for her with the children in the back seat. He spent a few hours driving around looking for Marcia, all the while "sending [her] agitating text messages trying to get her attention."

Around 6:30 p.m., Mammone took the children to his place for dinner. As he continued to text Marcia, he was "getting to the point of no return." He figured that he had already violated the protection order, and he had "had enough." He said that he had long hoped that things would improve, but stated that "once I suspected that she might have a guy that she was interested in that was it for me, I can't deal with that. It's just not anything that I'm willing to accept."

According to Mammone, after dinner he loaded the children into a gold 1992 Oldsmobile that he had recently purchased. He stated that he had a Beretta .32–caliber automatic handgun, a gasoline container (which he later stopped to refill), a Scripto lighter, a bag full of butcher-type knives, a bayonet, a baseball bat, and another bat-type weapon he had made by driving nails through a hickory shovel handle or axe handle. He also said that he had approximately a dozen painkillers. He took one pill around 9:00 p.m. to "deaden the pain" if he was shot by police officers later that night.

Mammone stated that he parked at Westminster Church (his and Marcia's "family church") just before 5:45 a.m. He stabbed Macy and James with a butcher knife while they were still strapped in their car seats. Mammone related that he had to stab each child in the throat four or five times, which was more than he had expected would be necessary. When detectives asked why he had stabbed the children rather than shooting them, Mammone offered three reasons: (1) noise, (2) uncertainty about whether his gun was dependable, and (3) a desire to conserve rounds for what might lie ahead.

Mammone said that after killing Macy and James, he drove to the Eakins' home at approximately 5:45 a.m. He left the children in the back seat of the car and "barged in" through the Eakins' unlocked door carrying his Beretta. Mammone found Margaret in a guest room and shot her in the chest. The gun jammed before he could fire a second round, so he began to hit Margaret with the gun. He then beat her with a lamp until the lamp began to fall apart. Mammone managed to unjam the gun and shot Margaret in the face at close range. He told police officers that a third bullet may have fallen out of the gun when he was attempting to dislodge the slide.

Mammone stated that he then drove to Marcia's nearby apartment. The truck that he had seen the previous evening was in the driveway. He poured gasoline on the truck and attempted to light it, but the lighter fell apart in his hands.

Mammone related that after he was unable to light the fire, he retrieved four weapons from his car: (1) the handgun, which he had to unjam again to prepare to fire, (2) the bayonet, which he put in his front pocket, (3) the baseball bat, and (4) the "bat type of weapon" that he had made. He smashed Marcia's screen-door window and back door with the bat and then entered the apartment. Once inside, Mammone unsuccessfully looked for matches or a lighter. He did not go upstairs because he was concerned that Marcia or "the person that was there to protect her" might have a firearm, and he did not want to be a "sitting duck." Mammone left the apartment and began throwing the baseball bat at a second-floor window, but he became frustrated. He searched his car for another lighter and, unable to find it, drove away.

After killing his mother-in-law and breaking into Marcia's apartment, Mammone drove around with the children's bodies for several hours. He had expected that he would want to die after committing these violent acts, but he was surprised to find that he "didn't really feel * * * like dying." He also "didn't feel like getting arrested," so he drove in areas where he did not expect to see police officers and drove the speed limit. He claimed that he then took approximately a dozen pills—which he identified as Valium or painkillers—but not enough to cause an overdose.

Mammone said that he then drove to the Independence Police Station to turn himself in, but he fell asleep in the station parking lot. When he woke, he contacted a relative who arranged for Mammone to turn himself in at a Canton park. En route to the park, Mammone decided to go by his apartment to switch to his BMW, with the idea of leaving the children in the Oldsmobile so that they would not be part of any scene at the park. But an unmarked police car was waiting for him, and he was apprehended.

Mammone told officers that he had contemplated "doing this" for 22 months, but that he had initially intended to kill Marcia, not Macy and James. He said that he killed his mother-in-law because it was "a major blow to [Marcia] to not have her mother." He indicated that hurting Marcia was one of the motives for killing Macy and James as well, but he also cited his objection to divorce as a reason for their murders. Mammone said that he did not intend to kill Marcia on June 8, but that he did plan to maim her. He had wanted to beat Marcia's uterus area with his homemade weapon (making her unable to conceive children), to break her ankles with the baseball bat (something she feared that she had seen done in a movie), and to cut out her tongue (as punishment for not speaking to him). Mammone also said that he would have killed the man at Marcia's apartment if he could have.

4. Forensic Evidence

Dr. P.S. Murthy, the Stark County coroner, performed autopsies on Margaret, Macy, and James on June 9, 2009. He testified that he determined that the cause of death for all three victims was homicide.

According to Dr. Murthy, Margaret had suffered two fatal gunshot wounds and more than 20 blunt-impact injuries and lacerations, consistent with being struck by the butt of a gun and by a household lamp. One bullet had been fired into Margaret's left upper lip from a distance of about six to eight inches and was recovered from the occipital lobe of her brain. Another bullet pierced Margaret's right upper shoulder, perforated her right lung, and exited through her back.

Dr. Murthy testified that both children died as a result of stab wounds with exsanguination (massive blood loss). Macy had multiple stab wounds to the neck, while James had a single stab wound that went through his neck. Both children's lungs were filled with aspirated blood. Macy's right hand and right leg bore multiple defensive wounds, and James had a defensive wound on his right hand.

According to a laboratory analyst who testified, multiple bloodstains on Mammone's shirt at the time of his arrest had DNA profiles consistent with Margaret's DNA. In addition, a laboratory analyst identified Mammone's fingerprint on a lighter that officers retrieved from a flowerbed near Marcia's apartment.

Law-enforcement officers took bodily fluid samples from Mammone on the day of his arrest. According to a laboratory analyst, tests did not reveal any trace of opiates or acetaminophen in Mammone's blood.

### B. The Defense Case

Mammone did not present a case in defense during the trial phase. Before the trial began, defense counsel advised the court during a bench conference that as a matter of strategy, Mammone had "elected to, in effect, concede the trial phase in this matter," and Mammone himself informed the judge that he instead preferred to focus on the second phase of trial. During a brief opening statement, defense counsel candidly explained to the jury that Mammone did not "contest[ ] much of the evidence and/or facts with respect to this matter." Mammone's counsel repeated that statement during trial-phase closing arguments, emphasized Mammone's honesty in responding to police officers' questioning, and urged the jury to decide the case based on the law rather than on emotion.

*State v. Mammone*, 13 N.E.3d 1051, 1060–65 (Ohio 2014) (paragraph numbers omitted).

On January 14, 2010, a jury convicted Mammone of the aggravated murder of his two children and his former mother-in-law, aggravated burglary, violation of a protective order, and attempted arson. Mammone's mother, his father, and a psychologist testified on his behalf at sentencing, and Mammone gave a five-hour unsworn statement. The jury recommended the death sentence for each aggravated murder. The trial court accepted the jury's recommendation, imposing three death sentences in open court on January 22, 2010. Additionally, the court sentenced Mammone to twenty-seven years of consecutive imprisonment for his noncapital offenses. The Ohio Supreme Court affirmed Mammone's convictions and sentences in 2014. *Mammone*, 13 N.E.3d at 1100. Mammone filed a post-conviction petition while his direct appeal was pending. The trial court denied the petition without an evidentiary hearing, and the Ohio Court of Appeals affirmed. *State v. Mammone*, No. 2012CA00012, 2012 WL 3200685 (Ohio Ct. App. 2012). Mammone moved to reopen his direct appeal in 2014 to raise claims of ineffective assistance of appellate counsel. The Ohio Supreme Court denied the motion in 2016.

Mammone filed a federal habeas petition in February 2017 and an amended petition in October 2017. The district court denied Mammone's petition in October 2019 and granted him a certificate of appealability ("COA") as to four claims and sub-claims. The district court subsequently amended the COA to clarify one of the claims. In February 2020, Mammone moved this court to stay the proceedings and hold his appeal in abeyance so he could litigate three claims in state court. We denied Mammone's motion in an order entered June 11, 2020, concluding he was not entitled to a stay and abeyance because his claims were exhausted and he had no remaining state court remedies. Mammone moved to expand the COA granted by the district court in July 2020, which we granted to include an additional subclaim.

## II. STANDARD OF REVIEW

We review a district court's denial of a petition for a writ of habeas corpus de novo and its factual findings for clear error. *Scott v. Houk*, 760 F.3d 497, 503 (6th Cir. 2014). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court shall not grant habeas relief on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

Under § 2254(d)(1), the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under § 2254(d)(2), the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* at 413; *see also Harrington v. Richter*, 562 U.S. 86, 100 (2011). Federal habeas relief is available only if the state court's decision was objectively unreasonable. *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004); *Joseph v. Coyle*, 469 F.3d 441, 468 (6th Cir. 2006). The petitioner must show that the state court's ruling was "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Section 2254(d) is a purposefully demanding standard, *Richter*, 562 U.S. at 102; *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (en banc), and it requires that state court determinations "be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct. *See* 28 U.S.C. § 2254(e)(1).

## III. DISCUSSION

There are four issues certified for appeal: (1) whether the state trial court should have presumed that the pretrial publicity about Mammone's case prejudiced his ability to receive a fair trial in Stark County; (2) whether the jurors violated Mammone's right to a fair trial by praying before their penalty-phase deliberations; (3) whether trial counsel were ineffective for: (a) failing to raise a defense of not guilty by reason of insanity, (b) failing to present evidence that Mammone has autism spectrum disorder, (c) failing to retain a neuropsychologist to evaluate Mammone, and (d) allowing Mammone to make an unsworn statement at the penalty phase or failing to prepare him to give a more effective statement; and (4) whether appellate counsel was

ineffective for not arguing that trial counsel were ineffective for urging the jury to consider Mammone's mental state as mitigation evidence under Ohio Rev. Code § 2929.04(B)(3) when the defense's own evidence foreclosed the jury's ability to do so.  We discuss each issue in turn.

**A.      Whether the state trial court should have presumed pretrial publicity about Mammone's case prejudiced his ability to receive a fair trial in Stark County.**

Mammone argues the trial court denied his right to due process and a fair trial by an impartial jury when it denied his motion for a change of venue due to pervasive and prejudicial pretrial publicity.  He contends that the trial court should have presumed prejudice and that the state and district courts' analyses were contrary to and an unreasonable application of clearly established federal law.  Mammone does not argue that any of the seated jurors were actually biased against him.

Before his trial began in state court, Mammone moved for a change of venue on the basis of pretrial publicity.  *Mammone*, 13 N.E.3d at 1065–66.  He pointed to articles from a local newspaper's website; comments posted by online readers; posts from other websites; and coverage by radio, television, and other publications.  *Id.*  Notably, Mammone himself sent a letter of confession to a local newspaper, which the newspaper published on the front page.  Mammone's confession letter was published four months before the trial and was not admitted into evidence.  *Id.* at 1069 & n.2.  Mammone contended that trying to seat a jury in Stark County, Ohio, would be futile and asked the trial court to presume prejudice.  The trial court found it would be premature to change venue before conducting voir dire and denied the motion, but it left the issue open for consideration during and after voir dire.  *Id.* at 1066.  The court asked each potential juror to complete an extensive publicity questionnaire and permitted thorough questioning about publicity during voir dire.  *Id.* at 1069.  Mammone did not renew his motion.

On direct appeal, the Ohio Supreme Court affirmed.  The court held that pretrial publicity did not justify the presumption of prejudice, that plain error review applied to Mammone's assertion of actual bias because he did not argue actual bias in the trial court, and that the trial court did not plainly err.  *Id.* at 1069–70.  The court noted prejudice from pretrial publicity is presumed only in rare cases.  *Id.* at 1067 (citing *Sheppard v. Maxwell*, 384 U.S. 333 (1966), *Estes v. Texas*, 381 U.S. 532 (1965), and *Rideau v. Louisiana*, 373 U.S. 723 (1963)).  The Ohio

Supreme Court listed the four factors that the Supreme Court has identified as relevant to the presumption of prejudice:

> (1) the size and characteristics of the community in which the crime occurred, (2) whether media coverage about the defendant contained "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," (3) whether the passage of time lessened media attention, and (4) whether the jury's conduct was inconsistent with a presumption of prejudice.

*Id.* at 1067–68 (quoting *Skilling v. United States*, 561 U.S. 358, 382–83 (2010)). The court observed, "*Skilling* did not hold that these four factors are dispositive in every case or indicate that these are the only relevant factors in a presumed-prejudice analysis." *Id.*

After comparing the instant circumstances to cases in which prejudice was presumed, the Ohio Supreme Court held that several factors distinguished Mammone's case. *Id.* at 1068–70. First, Mammone's confession was printed, not televised, so the public did not view him confessing. *Id.* at 1069. Second, the confession in *Rideau* was broadcast just weeks before trial and roughly one-third of the local population saw it, whereas Mammone's confession was published only once, more than four months before trial, and Mammone did not show that the letter's exposure was similar to that in *Rideau*. *Id.* Third, Mammone himself sent his confession to the newspaper, while the defendant in *Rideau* played no role in disseminating his confession. *Id.* Finally, the voir dire transcript refuted Mammone's assertion that many of the potential jurors had been prejudiced by media accounts; rather, dozens of potential jurors said they knew nothing about the case, all potential jurors were instructed to disregard information from outside sources, and the trial court excused those who indicated they could not set aside their preexisting opinions. *Id.* at 1069–70. The Ohio Supreme Court held that it could not conclude that pretrial publicity rendered Mammone's trial a "hollow formality." *Id.* at 1070 (quoting *Rideau*, 373 U.S. at 726). The district court held that the Ohio Supreme Court's decision was neither contrary to clearly established Supreme Court precedent nor involved an unreasonable application thereof.

The Constitution guarantees defendants the right to a fair trial by an impartial jury. *United States v. Tsarnaev*, 142 S. Ct. 1024, 1034 (2022); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "Prejudice resulting from pretrial publicity can be presumptive or actual." *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007). The Supreme Court has held presumed prejudice is

appropriate only in cases where press coverage "utterly corrupted" a trial's atmosphere. *See Murphy v. Florida*, 421 U.S. 794, 798 (1975) (citing *Irvin*, *Rideau*, *Estes*, and *Sheppard*). But such extreme cases are rare. *Skilling*, 561 U.S. at 381; *Foley*, 488 F.3d at 387. Extensive media coverage and knowledge within the community are insufficient to create a presumption of prejudice. *Dobbert v. Florida*, 432 U.S. 282, 303 (1977).

The Ohio Supreme Court's decision was a reasonable application of federal law. The state court correctly identified clearly established law on the presumption of prejudice. In *Skilling*, the Court called *Rideau* the "foundation precedent" on this issue and discussed *Estes* and *Sheppard*. 561 U.S. at 379–81. The circumstances in *Estes* and *Sheppard* are distinguishable because those cases, unlike this one, involved news media disrupting court proceedings. *See Estes*, 381 U.S. at 538 (in which pretrial publicity swelled to the point that reporters and television crews overran the courtroom and bombarded the community with coverage of pretrial hearings); *Sheppard*, 384 U.S. at 355 (in which "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom").

In *Rideau*, local television stations broadcasted a filmed interrogation in which the defendant confessed without counsel. 373 U.S. at 724. It was shown on television three times with estimated audiences of 24,000, 53,000, and 20,000 in a community of approximately 150,000. *Id.* The trial occurred less than two months after the defendant's confession was televised. *Id.* at 729 (Clark, J., dissenting). The Supreme Court held that the trial court denied the defendant due process when it denied a change of venue. *Id.* at 727. "For anyone who has ever watched television the conclusion cannot be avoided that this . . . in a very real sense was Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726. Mammone's case involved substantially less publicity. The community was exposed to the written word, not a televised spectacle. Mammone's letter appeared in the newspaper more than four months before trial, while the video of Rideau's confession aired less than two months before trial. Even if Mammone's letter was available on the web up to the time of trial, it presumably had its greatest impact when first printed. Mammone did not establish how many people were exposed to publicity about his case, or even attempt to demonstrate how widely the

newspaper was distributed, while the record in *Rideau*, by contrast, indicated a substantial portion of the community viewed the defendant's confession. *Id.* at 724.

In addition, the Ohio Supreme Court found that the voir dire transcript refuted Mammone's assertion that many of the potential jurors had been prejudiced by media accounts and had such strong opinions that they could not or would not change their minds. *Mammone*, 13 N.E.3d at 1069. The trial court required each potential juror to complete an extensive publicity questionnaire, permitted thorough questioning about publicity issues, instructed potential jurors to disregard information from outside sources, sought assurances that jurors would set aside preexisting opinions and be impartial, warned jurors to avoid publicity of the trial, and excused potential jurors who seemed incapable of setting aside preexisting opinions. *Id.* at 1069–70.

We defer to the trial court's assessment of the jurors' impartiality and credibility. *See Skilling*, 561 U.S. at 386. When considering issues of pretrial publicity, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge sits in the community allegedly influenced by the publicity and "may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror.'" *Id.* (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)). Mammone did not rebut the state court's factual finding, so it is presumed to be correct. *See* § 2254(e)(1). Finally, nothing in *Rideau* precludes a court from considering the defendant's role in pretrial publicity. There, the Court noted it was not the defendant's idea to broadcast his confession but concluded that the source of the publicity was irrelevant. *Rideau*, 373 U.S. at 726. The Court has not addressed Mammone's situation, in which a defendant first caused and later protested pretrial publicity. The Ohio Supreme Court's denial of Mammone's claim was not an objectively unreasonable application of Supreme Court precedent. *See Yarborough*, 541 U.S. at 665.

**B.    Whether the jurors violated Mammone's right to a fair trial by praying before their penalty-phase deliberations.**

Mammone argues that by praying, the jury abdicated its responsibility for sentencing by basing its determination on divine will rather than the weight of the aggravating and mitigating

factors.   He alleges that the jury's actions deprived him of a fair trial and fair and reliable sentencing, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Mammone raised this claim in his post-conviction petition.  In support, he submitted an affidavit from an Ohio Public Defender's Office investigator who interviewed five of the jurors. The investigator stated that before deliberations in the penalty phase, a juror asked if they could say a prayer and all of the jurors agreed to do so.  Mammone argued that the introduction of religion amounts to extrajudicial evidence and that the jurors substituted divine authority for their own responsibility for imposing death.  The trial court denied the claim.  The Ohio Court of Appeals affirmed, refusing to consider the affidavit under Ohio Rule of Evidence 606(B). *Mammone*, 2012 WL 3200685, at *3.  The district court held that the state court's denial of Mammone's claim was reasonable.  The court concluded that § 2254 foreclosed relief, noting that there is no Supreme Court precedent forbidding jurors from praying or holding that prayer amounts to an extraneous influence.

The Ohio Court of Appeals decision was not contrary to or an unreasonable application of Supreme Court precedent.  As an initial matter, Ohio Rule of Evidence 606(B) bars testimony from jurors about their deliberations or mental processes but permits admission of evidence that the jury was influenced by outside or extraneous information.  *See Hoffner v. Bradshaw*, 622 F.3d 487, 501 (6th Cir. 2010).  When cases "involve internal factors that affected the jury, rather than extraneous influences," *Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 756 (6th Cir. 2021), there is no constitutional impediment to enforcing Rule 606(B), *Hoffner*, 622 F.3d at 501. *See also Brown v. Bradshaw*, 531 F.3d 433, 436, 438 (6th Cir. 2008) (holding a juror's affidavit that other jurors bullied her into changing her vote was inadmissible under Ohio law and that enforcing the rule was constitutional).  We have distinguished cases involving the influence of extraneous information in which Rule 606(B) has been applied unconstitutionally.  *See Nian*, 994 F.3d at 756 (holding that where a case came down to a credibility determination and a juror introduced extraneous information about the defendant's criminal record during deliberations, applying Rule 606(B) to exclude juror testimony was constitutional error); *Doan v. Brigano*, 237 F.3d 722, 732 (6th Cir. 2001) (holding the state court's application of Rule 606(B) to prevent inquiry into a juror's injection of extraneous evidence conflicted with Supreme Court

precedent recognizing a defendant's constitutional right to confront the witnesses and evidence against him), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003).

A jury's verdict must be based on the evidence introduced at trial, not extraneous information. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992); *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Thompson v. Parker*, 867 F.3d 641, 647 (6th Cir. 2017). But Mammone cites no Supreme Court precedent holding that prayer by jurors amounts to the influence of extraneous information. He cites *Caldwell v. Mississippi*, 472 U.S. 320, 328–29 (1985), for the proposition that the jury cannot be "led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere," and *Sandoval v. Calderon*, 241 F.3d 765, 777 (9th Cir. 2000), for the argument that relying on divine authority undercuts the jury's responsibility for imposing the death penalty. Both cases involve prosecutorial misconduct and do not address juror prayer. Neither *Caldwell* nor *Sandoval* is applicable, and *Sandoval* is not Supreme Court precedent. Mammone has not shown that the state court's reliance on Rule 606(B) was contrary to or an unreasonable application of Supreme Court precedent.

## C.    Whether trial counsel were ineffective.

The district court certified three claims of ineffective assistance of trial counsel: whether trial counsel were ineffective for failing to raise a defense of not guilty by reason of insanity ("NGRI"), for failing to retain a neuropsychologist to evaluate Mammone, and for allowing Mammone to make an unsworn statement at the penalty phase. We expanded the COA to include an additional claim: whether trial counsel were ineffective for failing to present evidence that Mammone has autism spectrum disorder. Mammone argues that trial counsel rendered ineffective assistance by failing to thoroughly investigate his mental-health issues and present a proper defense based on his mental health conditions. He also argues that the district court should have granted his request for discovery and an evidentiary hearing. We discuss each claim in turn, beginning with those that are procedurally defaulted.

1. **Whether trial counsel were ineffective for failing to raise a defense of not guilty by reason of insanity.**

The district court held Mammone procedurally defaulted his NGRI claim by failing to raise it in state court, noting that he had no remaining state-court remedies. The district court held that "allowing a petitioner periodically to discover (or rediscover) information about himself would frustrate [AEDPA's purpose of achieving finality], and could incentivize capital defendants to deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death." *Mammone v. Jenkins*, No. 5:16CV900, 2019 WL 5067866, at *34 (N.D. Ohio Oct. 9, 2019) (quoting *Carter v. Mitchell*, 829 F.3d 455, 467 (6th Cir. 2016) (cleaned up)). The court also held Mammone could not excuse his default under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). It concluded that Mammone had not shown ineffective assistance of postconviction counsel where his counsel failed to raise a claim lacking factual support.

Mammone procedurally defaulted his claim that counsel should have pursued the NGRI defense. Mammone did not raise this claim on direct appeal or in collateral proceedings. "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). When a petitioner has failed to present a claim to the state courts and no state remedy remains available, the claim is technically exhausted and procedurally defaulted. *See id.* at 848; *Coleman v. Thompson*, 501 U.S. 722, 732 (1991); *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009).

Here, Mammone cannot raise his NGRI claim in either a successive post-conviction petition under Ohio Revised Code § 2953.23 or a motion for a new trial under Ohio Rule of Criminal Procedure 33. Ohio law bars successive post-conviction relief petitions "unless the petitioner was unavoidably prevented from discovering the facts on which he later seeks to rely, or the United States Supreme Court has recognized a new right that applies retroactively to the petitioner." *Landrum v. Mitchell*, 625 F.3d 905, 919 (6th Cir. 2010) (citing Ohio Rev. Code § 2953.23(A)(1)(a)). The petitioner must also "show that, but for the error, no reasonable factfinder would have found the petitioner guilty, or, in a death penalty case, eligible for the

death sentence." *Id.* (citing § 2953.23(A)(1)(b)). A motion for a new trial based on newly discovered evidence must be filed within 120 days of the verdict unless the defendant was "unavoidably prevented from discovering the evidence" within that time period. Ohio R. Crim. P. 33(B).

Mammone was not unavoidably prevented from discovering the basis for his NGRI defense. The claim relies on his mental status at the times of his offenses and his trial, so he and his mental-health records are the relevant sources of information. Defense counsel's expert, forensic psychologist Jeffrey Smalldon, undertook a comprehensive review of Mammone's background and met with him for twenty hours over seven different occasions. As the district court noted, Dr. Smalldon was a qualified expert with extensive experience in death-penalty cases who ultimately opined that Mammone was not insane at the time of the crimes and did not qualify for the not guilty-by-reason-of-insanity defense.

Mammone points to a second opinion he obtained eight years after trial from Diane Mosnik, a clinical neuropsychologist and forensic psychologist, who took issue with some of Dr. Smalldon's diagnoses. Dr. Mosnik's 2017 opinion is new in the sense that it did not exist at the time of Mammone's trial, direct appeal, or post-conviction petition. However, aside from her in-person evaluation, Dr. Mosnik based her diagnoses on the records of Mammone's prior treatment. Dr. Smalldon met with Mammone in preparation for trial, reviewed his history, administered tests, diagnosed him, and testified that he was sane at time of his crimes. Forensic psychologist Dr. Robert Stinson evaluated Mammone for his post-conviction proceedings, found indications of neurological, neurophysiological, and/or neuropsychological deficits, and recommended that Mammone be evaluated by specialists in those fields. Because Drs. Smalldon and Stinson were able to assess Mammone in preparation for his state-court proceedings, the basis for his NGRI claim existed long before he raised it in his habeas petition. Finally, Mammone does not rely on a new constitutional right made retroactive to him. *See* § 2953.23(A)(1)(a); *Landrum*, 625 F.3d at 919. He cannot exhaust his claim through a second or successive post-conviction petition or a motion for a new trial and therefore has no remaining state-court remedies. *See* Ohio R. Crim. P. 33(B); Ohio Rev. Code § 2953.23(A)(1). Mammone's claim is procedurally defaulted.

Further, Mammone cannot excuse his procedural default through *Martinez* and *Trevino*. In *Martinez*, the Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 566 U.S. at 17. A substantial claim is one that has some merit. *Id.* at 14. The Court extended this rule to Texas in *Trevino*, holding that where a state's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal," procedural default is excused. 569 U.S. at 428–29.

We have not yet decided whether *Trevino* and *Martinez* apply to Ohio cases generally. *See Henness v. Bagley*, 766 F.3d 550, 557 (6th Cir. 2014). "[T]he application of *Trevino* to Ohio ineffective-assistance claims is neither obvious nor inevitable." *McGuire v. Warden*, 738 F.3d 741, 752 (6th Cir. 2013). This is because Ohio law provides for two kinds of ineffective-assistance-of-trial-counsel claims: ineffective-assistance-of-trial-counsel claims that do not depend on evidence outside the record must be brought on direct appeal, while claims that rely on evidence outside the record are raised in post-conviction petitions. *Id.* at 751–52. In *McGuire*, we found that the reasons for excusing default under *Trevino* applied weakly at best because the Ohio Supreme Court addressed the petitioner's claim of ineffective assistance of trial counsel when he alleged that counsel should have raised it on direct appeal. *See id.* at 752. We held that, even if *Trevino* applied, the petitioner's claim was not substantial. *Id.* In an earlier case, we held that *Martinez* could not excuse the petitioner's alleged default because he was permitted to, and did, raise his ineffective-assistance-of trial-counsel-claim on direct appeal. *Moore v. Mitchell*, 708 F.3d 760, 785 (6th Cir. 2013).

Mammone argues that we applied *Trevino* to an Ohio habeas case in *White v. Warden*, 940 F.3d 270 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 2826 (2020). In *White*, the petitioner raised a claim of ineffective assistance of trial counsel on direct appeal. 940 F.3d at 274. The Ohio Court of Appeals denied it because the trial court record lacked the facts necessary to fully consider it. *Id.* By the time the petitioner's direct appeal ended, it was too late for him to raise his claim in post-conviction proceedings. His pro se post-conviction petition was dismissed as

untimely. *Id.* This court held that *Martinez* and *Trevino* provided cause to excuse the petitioner's procedural default because he raised a substantial claim of ineffective assistance of trial counsel, he did not have counsel in post-conviction proceedings, those proceedings were his first opportunity for a merits review of his claim, and Ohio law made it unlikely that his claim could have been reviewed on direct appeal. *Id.* at 278. The court remanded the case to the district court for de novo review and the possibility of an evidentiary hearing. *Id.* (citing *Detrich v. Ryan*, 740 F.3d 1237, 1247 (9th Cir. 2013) (en banc) for the proposition that a petitioner who demonstrated cause under *Martinez* was entitled to an evidentiary hearing notwithstanding § 2254(e)(2)). *White* illustrates that *Martinez* and *Trevino can* apply in an Ohio case, but it does not show that they apply to Ohio cases generally. *See Henness*, 766 F.3d at 557.

We need not resolve the issue conclusively because, even if *Martinez* and *Trevino* are relevant here, Mammone would still have to show that his post-conviction counsel were ineffective for failing to raise the NGRI claim and that the claim is substantial. *See Martinez*, 566 U.S. at 16. Mammone cannot excuse his default because the claim is not substantial. *See id.*

To prevail on a claim of ineffective assistance, a petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009). "Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. The defendant must overcome the presumption that his counsel's actions were sound strategy. *Pinholster*, 563 U.S. at 189; *Strickland*, 466 U.S. at 689. Counsel's failure to explore an NGRI defense can amount to ineffective assistance. *See Lundgren v. Mitchell*, 440 F.3d 754, 771 (6th Cir. 2006). Counsel in a death-penalty case have a duty to reasonably investigate the defendant's background and present mitigating evidence to the jury. *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003); *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir. 2011). Counsel's performance prejudices a defendant in the guilt phase if "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (per curiam) (quoting *Strickland*, 466 U.S. at 695). To assess potential prejudice at sentencing, we reweigh the

evidence in aggravation against the total available mitigating evidence to determine whether a reasonable probability exists that the defendant would have received a sentence less than death had counsel not erred. *Wiggins*, 539 U.S. at 534-6; *Strickland*, 466 U.S. at 695. The petitioner must present new evidence that differs both in strength and subject matter from the evidence presented at sentencing, not just cumulative mitigation evidence. *Jackson v. Bradshaw*, 681 F.3d 753, 770–71 (6th Cir. 2012); *Phillips v. Bradshaw*, 607 F.3d 199, 216 (6th Cir. 2010). We need not address both performance and prejudice if the defendant does not make a sufficient showing of one. *Strickland*, 466 U.S. at 697.

Mammone's underlying claim that trial counsel should have pursued a defense of NGRI is not substantial because he cannot overcome the presumption that his trial counsel's actions were strategic. *See Burt v. Titlow*, 571 U.S. 12, 23 (2013); *Strickland*, 466 U.S. at 689. Mammone's claim is based on Dr. Mosnik's opinion, in which she diagnosed him as having major depressive disorder with anxious distress, psychotic features, and autism spectrum disorder. She opined that Mammone did not know the wrongfulness of his acts as the result of serious mental disease. Dr. Mosnik criticized Dr. Smalldon's understanding of Ohio's insanity defense. According to Dr. Mosnik, Dr. Smalldon testified that Mammone knew the difference between right and wrong, but the proper question was whether he knew the wrongfulness of his acts.

Ohio's insanity defense requires the defendant to prove that at the time of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his acts. Ohio Rev. Code § 2901.01(A)(14). NGRI is an affirmative defense that the defendant must prove by a preponderance of the evidence. *See* § 2901.05(A); *State v. Hancock*, 840 N.E.2d 1032, 1043 (Ohio 2006). The jury determines what weight to give the evidence, the credibility of the witnesses, and whether the defendant is insane. *State v. Thomas*, 434 N.E.2d 1356, 1357–58 (Ohio 1982). The term "wrongfulness" applies to legal, not moral, wrongs. "[A] defendant who knows his actions are against the law but acts under a command from God understands the 'wrongfulness' of his actions under [Ohio Revised Code §] 2901.01(A)(14)." *State v. Carreiro*, 988 N.E.2d 21, 27 (Ohio Ct. App. 2013). Ohio courts have described the test for insanity as whether the defendant knew right from wrong. *See id.* at 27 (holding the defendant was not

entitled to jury instructions on NGRI because "[i]nstead of acting pursuant to a command from God, [he] was able to appreciate the difference between right and wrong and simply chose to transgress these boundaries"); *State v. Taylor*, 781 N.E.2d 72, 86 (Ohio 2002) ("Appellant was not insane and understood right from wrong."); *State v. Reynolds*, 89 N.E.3d 235, 244 (Ohio Ct. App. 2017) ("Reynolds' 'goal oriented' behavior indicates that he appreciated right from wrong.")

Dr. Smalldon testified at sentencing that, at the time of the murders, Mammone was under extreme emotional distress and suffered from a severe mental disorder but knew the difference between right and wrong and knew his acts were illegal. Dr. Smalldon opined that Mammone "was able to know the difference between right and wrong at the time these offenses were committed." DE 11-6, Tr., Page ID 6047. Dr. Smalldon testified that Mammone knew his acts were "wrong in the eyes of the law" and that Mammone knew "his conduct on this night was criminal." *Id.* at 6047, 6068. Mammone justified killing his children by saying that it was the correct thing to do to restore them to their purity. However, his religious justification neither negates his knowledge that he broke the law nor means that he did not understand the wrongfulness of his actions. *See* § 2901.01(A)(14); *Carreiro*, 988 N.E.2d at 27.

Mammone has not shown that his trial counsel performed deficiently. Trial counsel had him examined by an experienced and well-qualified mental health expert who concluded Mammone knew that his acts were wrong and illegal. Dr. Smalldon's understanding of the insanity defense was consistent with Ohio law. *See Carreiro*, 988 N.E.2d at 27; *Taylor*, 781 N.E.2d at 86. Mammone has presented no evidence that Dr. Smalldon was incompetent or unqualified, so counsel reasonably relied on his opinion when they chose not to pursue the NGRI defense. *See Hinton*, 571 U.S. at 275; *McGuire*, 738 F.3d at 758; *Hodges v. Colson*, 727 F.3d 517, 545 (6th Cir. 2013). Even assuming we could consider her testimony, *but see Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022) ("[A] federal habeas court may not … consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."); *see also Shoop v. Twyford*, 142 S. Ct. 2037, 2044 (2022) (discussing the "quite limited situations" in which a federal court can consider new evidence in a § 2254 proceeding), Dr. Mosnik's opinion does not show ineffectiveness of trial counsel. *See McGuire*, 738 F.3d at

758. In *Lundgren*, for example, the defendant stated he killed four members of his religious cult at God's command. 440 F.3d at 761. Defense counsel retained two mental health experts, who concluded that the defendant was not insane. *Id.* at 773. In post-conviction proceedings, a third expert[1] opined the defendant should have been seen as eligible for the NGRI defense. *Id.* at 772. This court held trial counsel reasonably investigated the defendant's mental state and their decision not to pursue an insanity defense was reasonable. *Id.* "The question before this Court . . . is not whether all mental health experts would agree on whether the defense was viable, but whether counsel's decision not to pursue the defense was a reasonable strategic choice." *Id.*; *see also Morris v. Carpenter*, 802 F.3d 825, 841 (6th Cir. 2015) (holding counsel reasonably relied on their experts when they chose not to pursue an insanity defense); *Wong v. Money*, 142 F.3d 313, 320 (6th Cir. 1998) (same). As in *Lundgren*, Mammone's counsel performed reasonably when they investigated his mental state, relied on their experts' opinions, and made the strategic choice not to pursue an NGRI defense.

In sum, Mammone's claim that counsel should have pursued the NGRI defense is procedurally defaulted. Even if applicable, *Martinez* and *Trevino* cannot excuse this procedural default of claims through ineffective assistance of post-conviction counsel because the underlying claims of ineffective assistance of trial counsel are not substantial.

### 2. Whether trial counsel were ineffective for failing to present evidence that Mammone has autism spectrum disorder.

Mammone did not present his autism spectrum disorder claim on direct appeal or in his post-conviction petition, raising it for the first time in his habeas petition. The district court held that Mammone procedurally defaulted this claim by failing to raise it in state court, that he had no remaining state court remedies, and that he could not excuse his default under *Martinez* and *Trevino*.

Mammone procedurally defaulted his claim that counsel should have presented evidence he suffers from autism spectrum disorder. Mammone did not raise this claim on direct appeal or

---

[1]This expert was Dr. Smalldon. *Lundgren*, 440 F.3d at 772 ("Petitioner submits an affidavit of Ph.D. psychologist Jeffrey Smalldon who opines that [he] 'should have been seen as eligible . . . for a defense of not guilty by reason of insanity.'").

in collateral proceedings. Mammone cannot raise his autism-spectrum-disorder claim in either a successive post-conviction petition under Ohio Revised Code § 2953.23 or a motion for a new trial under Ohio Rule of Criminal Procedure 33. He was not unavoidably prevented from discovering the basis for this claim, as it relies on his mental status at the times of his offenses and his trial. Dr. Mosnik's diagnoses are based on the records of Mammone's prior treatment, so the basis for his autism-spectrum-disorder claim existed before he raised it in his habeas petition. Mammone does not rely on a new constitutional right made retroactive to him. *See* § 2953.23(A)(1)(a); *Landrum*, 625 F.3d at 919. Mammone's claim is procedurally defaulted.

Even if *Martinez* and *Trevino* apply, Mammone cannot excuse his default because his claim that post-conviction counsel were ineffective for failing to raise the autism spectrum disorder claim is not substantial. *See Martinez*, 566 U.S. at 16. Mammone presented no evidence that his counsel erred by retaining Dr. Smalldon to evaluate him or by relying on Dr. Smalldon's opinion of Mammone's mental status. Mammone now relies on Dr. Mosnik's 2017 diagnosis that he has autism spectrum disorder. He argues that evidence of autism spectrum disorder would have given the jury context for his rigid demeanor during trial and his five-hour unsworn statement and would have provided mitigating evidence for the jury to consider. But selecting an expert is the classic example of a strategic choice made by counsel. *Hinton*, 571 U.S. at 275 (quoting *Strickland*, 466 U.S. at 690).

Attorneys are entitled to rely on the opinions and conclusions of a mental health expert unless they have good reason to believe the expert is incompetent or unqualified. *Morris*, 802 F.3d at 841; *McGuire*, 738 F.3d at 758; *Hodges v. Colson*, 727 F.3d 517, 545 (6th Cir. 2013). In *Morris*, defense counsel presented experts to testify about the effects of cocaine and alcohol to argue that the defendant lacked the requisite intent for first-degree murder. 802 F.3d at 841. They chose not to pursue an insanity defense because no expert found that the defendant was mentally ill. In post-conviction proceedings, however, the defendant's expert witnesses testified that the defendant was bipolar. We held that defense counsel reasonably relied on their expert witnesses' testimony. *Morris*, 802 F.3d at 841-42. "[S]imply introducing the contrary opinion of another mental health expert during habeas review is not sufficient to demonstrate the

ineffectiveness of trial counsel." *McGuire*, 738 F.3d at 758; *see also Pike v. Gross*, 936 F.3d 372, 381 (6th Cir. 2019); *Hill v. Mitchell*, 842 F.3d 910, 944 (6th Cir. 2016).

Mammone's trial counsel retained Dr. Smalldon to examine him and testify on his behalf. Dr. Smalldon diagnosed Mammone with a severe personality disorder, unspecified, with schizotypal, borderline, and narcissistic features. Dr. Stinson, who evaluated Mammone for post-conviction proceedings, agreed with Dr. Smalldon's diagnosis but opined that Mammone should have been tested for neurological, neurophysiological, and/or neuropsychological deficits. None of the mental health experts who treated or evaluated Mammone before 2017 suggested that he had autism spectrum disorder. Mammone does not suggest that Dr. Smalldon was incompetent or unqualified, so counsel reasonably relied on his opinions. *See Morris*, 802 F.3d at 841; *McGuire*, 738 F.3d at 758; *Hodges*, 727 F.3d at 545. Trial counsel's selection of Dr. Smalldon was a strategic choice and virtually unchallengeable. *See Hinton*, 571 U.S. at 275. Dr. Mosnik's different diagnosis does not show that trial counsel were ineffective. *See Pike*, 936 F.3d at 381; *Hill*, 842 F.3d at 944; *McGuire*, 738 F.3d at 758. Mammone cannot show that his counsel performed deficiently by relying on Dr. Smalldon and failing to discover evidence to support a diagnosis of autism spectrum disorder. Because Mammone cannot establish deficient performance, we need not consider prejudice. *See Strickland*, 466 U.S. at 697; *Hutton*, 839 F.3d at 501.

Mammone's claim that counsel should have presented evidence that he had autism spectrum disorder is procedurally defaulted. Even if applicable, *Martinez* and *Trevino* cannot excuse this procedural default because the underlying claim of ineffective assistance of trial counsel is not substantial.

### 3. Whether trial counsel were ineffective for failing to retain a neuropsychologist to evaluate Mammone.

In his state court post-conviction proceedings, Mammone alleged his trial counsel were ineffective for failing to retain a neuropsychologist and failing to request neuroimaging. In support, he submitted an affidavit by Dr. Stinson recommending that Mammone be evaluated by specialists in neurology, neurophysiology, and neuropsychology to look for brain dysfunction, neurological insults, and neuropsychological deficits. Mammone requested funding for such

testing. The trial court denied Mammone's request for funding and denied his petition, and the Ohio Court of Appeals affirmed. DE 10-22, J. Entry, Page ID 2419–20; *Mammone*, 2012 WL 3200685, at *2–3.

Before trial, the trial court appointed forensic psychologist Dr. Smalldon at Mammone's request. Dr. Smalldon testified he had done neuropsychological assessments for neurologists, neurosurgeons, and other specialists. He met with Mammone for approximately twenty hours, administered numerous tests, reviewed extensive records, and conducted third-party interviews. He diagnosed Mammone with a severe personality disorder, not otherwise specified, with schizotypal, borderline, and narcissistic features. Dr. Smalldon found that Mammone was not actively psychotic but had characteristics of people who were psychotic. He also noted that Mammone exhibited passive aggressive and obsessive compulsive personality traits and generalized anxiety disorder. Dr. Smalldon found no indication of a brain disorder or brain damage. The Ohio Court of Appeals held that the trial court did not err in rejecting Dr. Stinson's affidavit and denying Mammone's claim:

> In his affidavit, Dr. Stinson, who possesses the same credentials as Dr. Smalldon, advanced the opposite opinion. We fail to see that the presence of a contradicting opinion by one who never interviewed appellant would result in any affirmative help to appellant's case. The affidavit is only an offer of a contradicting opinion and not definitive evidence on the issue.

*Mammone*, 2012 WL 3200685, at *2–3. The district court agreed with the state court that Mammone's counsel performed reasonably when they relied on Dr. Smalldon's opinion that Mammone did not show signs of neurological damage.

On appeal, Mammone argues that trial counsel were ineffective for failing to have him examined by a neuropsychologist. He asserts that "trial counsel's failure to obtain a neuropsychologist to evaluate [him] and testify regarding his deficits deprived the jurors of significant mitigating evidence." CA6 R. 25, Appellant Br., at 11. This claim is subject to AEDPA review because the Ohio Court of Appeals denied it on the merits. *Mammone*, 2012 WL 3200685, at *2. When AEDPA review applies to a claim of ineffective assistance of counsel, our review of the state court decision is "doubly deferential" and gives both the state court and defense counsel the benefit of the doubt. *Titlow*, 571 U.S. at 15 (citation omitted);

*Pinholster*, 563 U.S. at 190. "A federal court may grant relief only if *every* 'fairminded jurist' would agree that *every* reasonable lawyer would have made a different decision." *Dunn v. Reeves*, 141 S. Ct. 2405, 2411 (2021) (per curiam) (cleaned up) (quoting *Richter*, 562 U.S. at 101). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. Mammone must meet his burden on the record that was before the Ohio Supreme Court. *See Pinholster*, 563 U.S. at 181–82.

There is a reasonable argument that Mammone's counsel satisfied *Strickland*'s deferential standard. *See Richter*, 562 U.S. at 105. Counsel retained a psychologist, Dr. Smalldon, who performed neuropsychological screening tests on Mammone. Although Dr. Smalldon is a psychologist, not a neuropsychologist, he is highly experienced with capital cases and has performed "neuropsychological assessments" for neurologists, neurosurgeons, and other specialists. The trial court deemed him qualified as an expert in forensic psychology. Dr. Smalldon testified that because Mammone had sustained a head injury as a teenager, he screened Mammone for brain damage. He met with Mammone for approximately twenty hours, administered numerous tests, reviewed extensive records, and conducted third-party interviews. That Dr. Smalldon screened Mammone for brain damage indicates that the issue of potential neurological deficits was a focus of the defense. Mammone has not pointed to any evidence that Dr. Smalldon was incompetent or unqualified. It was not unreasonable for Mammone's counsel to rely on Dr. Smalldon's opinion that Mammone did not exhibit signs of neurological damage. That Dr. Stinson opined in an affidavit that Mammone *may* have had a brain impairment does not make counsel's performance deficient. The Ohio Court of Appeals reasonably concluded that Mammone suffered no prejudice.

### 4. Whether trial counsel were ineffective for allowing Mammone to make an unsworn statement at the penalty phase or failing to prepare him to give a more effective statement.

On direct appeal, Mammone argued his counsel failed to prepare him for the mitigation phase of trial and should not have allowed him to make a five-hour unsworn statement without guiding or limiting his presentation by asking questions.

The Ohio Supreme Court held Mammone could not show ineffective assistance of counsel because he, not his counsel, had the choice of testifying or giving a statement. *Mammone*, 13 N.E.3d at 1088. It also found the decision was a tactical one. *Id.* The court acknowledged that Mammone's statement was lengthy but described it in favorable terms:

> Mammone's statement was well spoken, coherent, and organized. For the most part, the statement amplified the confession Mammone had made to police officers the day he was arrested and gave the jury an opportunity to observe his personality and learn more about his background. Moreover, because the court permitted Dr. Smalldon to observe the statement, Dr. Smalldon was able to refer to it during his own testimony. Under the circumstances, to the extent that trial counsel may have influenced Mammone's decision to give an unsworn statement, allowing the statement was objectively reasonable as a matter of strategy.

*Mammone*, 13 N.E.3d at 1088 (citing *State v. Jalowiec*, 744 N.E.2d 163 (Ohio 2001)). The Ohio Supreme Court further held that even if trial counsel performed deficiently, Mammone was not prejudiced. *Id.* at 1088–89. Mammone argued his statement was harmful because it was long, cold, and detached, and because the jury had no context to connect it to his mental illness. *Id.* at 1089. The court found Mammone could not show a reasonable likelihood of a life sentence but for his unsworn statement because, for the most part, it amplified his confession to the police, which was played for the jury. *Id.* at 1088–89.

The district court found the Ohio Supreme Court's decision objectively reasonable. It noted the record was devoid of evidence that counsel failed to prepare Mammone and that "even if Mammone had given a more controlled statement (or none at all), there was simply no probability of the jury's recommending anything but a death sentence." *Mammone*, 2012 WL 5067866, at *53.

On appeal, Mammone argues that trial counsel were ineffective for "abandon[ing]" him when he made the five-hour unsworn statement. CA6 R. 25, Appellant Br., at 40–43. He asserts trial counsel did not guide or limit his statement and "failed to present to the jury a context within which to interpret the unsworn statement." *Id.* at 41. This claim is subject to AEDPA review because the Ohio Supreme Court denied it on the merits. *Mammone*, 13 N.E.3d at 1088–89. Therefore, our review gives both the state court and defense counsel the benefit of the doubt. *Pinholster*, 563 U.S. at 190.

Ohio law grants a capital defendant the right to make an unsworn statement at the penalty stage that is not subject to cross-examination. Ohio Rev. Code § 2929.03(D)(1). At the close of the prosecution's guilt-phase case, Mammone acknowledged on the record that his trial counsel had discussed the possibility of Mammone's giving an unsworn statement in the sentencing phase. The sentencing transcript refers to Mammone's decision to do so. Mammone did not present evidence from outside the trial court record because he raised this claim on direct appeal. *See McGuire*, 738 F.3d at 751–52. There is no indication in the record of what advice or preparation Mammone's counsel provided. When a petitioner does not present evidence in state court to support a claim of ineffective assistance, he has not rebutted the presumption that counsel had a reasonable strategy for the challenged decision. *Dunn*, 141 S. Ct. at 2412; *see also Titlow*, 571 U.S. at 23 ("[T]he absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" (citation omitted)); *Carter v. Mitchell*, 443 F.3d 517, 531 (6th Cir. 2006) (holding petitioner's failure to detail trial counsel's efforts to learn of his background provided no basis for finding counsel's investigation unreasonable). Regardless of whether the defendant has presented evidence of counsel's strategy, the court can consider possible reasons for counsel's decisions not expressed by counsel. *See Pinholster*, 563 U.S. at 196.

There is a reasonable argument that counsel's performance satisfied the doubly deferential standard of *Strickland* under AEDPA review. *See Richter*, 562 U.S. at 105. Mammone cannot point to any evidence that counsel failed to advise him of the possible risks of giving an unsworn statement or that they did not prepare him adequately. His counsel may have simply respected his statutory right to give an unsworn statement. Or they may have reasoned Mammone's unsworn statement would allow the jurors to hear about his background and beliefs directly from him and lead them to conclude that he was so disturbed that he should not be sentenced to death. In closing argument, Mammone's counsel reminded the jury that Mammone had told them about his bizarre set of rigid behavioral codes. She concluded by telling the jurors that sentencing was about the appropriate sentence for a person with "such a degree of . . . craziness." DE 11-6, Tr., Page ID 6158–59. Counsel may also have decided that Mammone's unsworn statement would give Dr. Smalldon the opportunity to comment on it, as he did. Dr. Smalldon testified that watching Mammone's unsworn statement did not change his diagnosis.

In the absence of evidence to the contrary, Mammone has not rebutted the presumption that counsel performed reasonably when they acceded to his decision to give his unsworn statement. *See Dunn*, 141 S. Ct. at 2412; *Titlow*, 571 U.S. at 23. The Ohio Supreme Court decided reasonably that Mammone did not show deficient performance.

Even if counsel for Mammone performed unreasonably, he cannot show prejudice. Mammone argued to the Ohio Supreme Court that his unsworn statement was long, cold, and detached, and the jury had no context to connect it to his mental illness. *Mammone*, 13 N.E.3d at 1089. The Ohio Supreme Court held Mammone could not show a reasonable likelihood of a life sentence but for his unsworn statement because, for the most part, it amplified his confession to the police. *Id.* at 1088–89. This, too, was a reasonable decision. Mammone's unsworn statement was similar to his confession introduced at trial, included mitigating evidence, and revealed the idiosyncratic nature of his beliefs. An examination of Mammone's confession and his unsworn statement confirms that Mammone was not prejudiced by his counsel's decision to let him give his unsworn statement.

Mammone's confession to the police began with the night before the murders. He described trying to find Marcia, texting her, and getting to the "point of no return" because he could not accept her being with another man. *Mammone*, 13 N.E.3d at 1063. He gave detailed descriptions of how he killed his children and his former mother-in-law. Mammone seemingly prepared for suicide by cop, but he also tried to avoid being injured or caught. When he broke into Marcia's house, he did not go upstairs because he thought Marcia or the man Mammone believed was with her might be armed. Mammone told the police he had thought about "doing this" for twenty-two months since Marcia first tried to leave him. *Id.* at 1064. He originally intended to kill Marcia, not the children, and said he killed Marcia's mother to punish Marcia. On the night of the killings, he had intended to maim Marcia, not kill her. He wanted to beat her with a weapon in such a way that she could not have any more children, break her ankles because he knew she feared that injury, and cut out her tongue because she would not talk to him.

Mammone's unsworn statement conveyed much of the same information as his confession, but also included mitigating facts and permitted Mammone to explain his family

background and his beliefs about marriage, children, and religion. *Mammone*, 13 N.E.3d at 1093–96; DE 11-6, Tr., Page ID 5725–5979. He detailed his father's alcoholism and physical abuse, his parents' divorce, and his mother's depression. Mammone thought his family was not the way families should be. Mammone described his relationship to Marcia, stating that when he met her, she shared his views about commitment and God and that he went to church with her and her family. Mammone's account of the collapse of his marriage and his reaction focused on the importance of family and religion. In at least two instances, Mammone threatened to kill Marcia and the children if she left him because he would rather they be dead with God than be raised in a broken home. Mammone's feelings about Marcia were conflicted, and his own thoughts disturbed him. He told the jury he believed that everything is the will of God, and that God did not permit him to hurt Marcia.

Next, Mammone described the events of June 7 and 8 from his perspective. The testimony was largely consistent with his confession, but Mammone described his motives differently. He emphasized his frustration with Marcia and her family's refusal to respond to his concerns about the children. Mammone recounted the manner in which he killed his children, stating he killed them in the parking lot of the church where they were baptized because he "was put there to send them back to be with God." DE 11-6, Tr., Page ID 5933. He said he was "completely stunned by the whole thing," prayed after killing them, and felt a surge of aggression when he saw his children deceased. *Id.* at 5937–38. He stated "what happened to the children was one thing that [he] felt was necessary to happen" but that the events that followed were "something completely different." *Id.* at 5938. After detailing how he killed his mother-in-law, Mammone said he felt for a couple of minutes that he had turned his back on his beliefs and what "was right and wrong with God." *Id.* at 5941–46. He was shocked that his children were in fact dead and that "this actually had happened." *Id.* at 5946.

When he broke into Marcia's apartment, his aggression was gone, and he felt "a combination of remorse and disbelief." *Id.* at 5948. He left a voicemail for Marcia after leaving her apartment informing her he had killed her mother and said he had been trying to get everyone's attention for months. Mammone felt God intervened and kept him from hurting Marcia, and he was grateful for that. He had "definitely intended" to harm Marcia in the ways he

later confessed to the police, but he told the jury he doubted he could have actually hurt her. *Id.* at 5957. Mammone hoped the jurors could wrap their heads around what happened and what he went through. He thought he was a "great guy" but ended up as a "raving lunatic" who killed people. *Id.* at 5965–66.

The final part of Mammone's unsworn statement to the jury had religious themes. He said he wanted to turn himself in with as much discretion as possible because he did not want anyone to see the children. He was not worried about the legal ramifications. Mammone told the jury he had planned on dying but felt responsible for handing the children over properly. He feels a spiritual connection with his children and his former mother-in-law. Mammone stated that he hoped that his children's lives were not in vain, and that people would be outraged by what happened because he did not want to see it happen to anyone else. He hoped people would commit themselves to God, take care of their children, and learn from this tragedy.

Mammone did not show a reasonable probability that the jury would have spared him the death penalty if counsel had not allowed him to give his unsworn statement, had better prepared him for it, or had limited its length. *See Wiggins*, 539 U.S. at 536–37; *Strickland*, 466 U.S. at 695. As the Ohio Supreme Court found, his statement mirrored his confession. Both described the murders in detail, and the transcripts do not suggest that Mammone showed emotion or regret in either one. In addition, Mammone's unsworn statement may have had some mitigating value. It placed his actions in the context of his childhood, his religious beliefs, and his views of marriage and family. The jury could have found his account of the abuse he suffered as a child and the effects of his parents' divorce to be mitigating. Mammone told the jury about the importance he placed on religion, marriage, and family and the torment he felt from the breakup with Marcia. Dr. Smalldon testified about Mammone's beliefs and psychological disorder, and trial counsel referred to his "craziness" in closing argument.

Mammone's unsworn statement downplayed the role of jealousy and revenge as motives, focusing instead on his religious views. In his confession, the suspicion that Marcia had a boyfriend appeared to have set him off and he told police he committed the murders to hurt her. *Mammone*, 13 N.E.3d at 1063–64. By contrast, in his unsworn statement, Mammone focused on his frustration with the break-up of his marriage and his belief that his children were better off

dead than growing up in a broken home. *Id.* at 1094. It is not obvious that Mammone's unsworn statement made him appear more culpable than his confession, and his statement may have been more consistent with trial counsel's argument that he was seriously mentally ill. As indicated above, the evidence in aggravation significantly outweighed the mitigating evidence. There is not a reasonable probability that his unsworn statement was so much more inflammatory than his confession that it swayed the jury to vote for the death penalty. The Ohio Supreme Court's conclusion on this issue was reasonable.

**5. Whether the district court improperly denied Mammone's request for discovery and an evidentiary hearing.**

Additionally, Mammone argues the district court abused its discretion when it denied him discovery and an evidentiary hearing on his claims of ineffective assistance of trial counsel. He contends the district court was required to grant his requests to depose trial counsel, post-conviction counsel, and Dr. Smalldon, and consider any new evidence from those depositions. The district court did not grant a COA on this issue, nor has Mammone requested one. Citing a single unpublished case, the respondent maintains that the lack of a COA deprives us of jurisdiction to consider the argument. CA6 R. 26, Appellee Br., at 42 (citing *Onunwor v. Moore*, 655 F. App'x 369, 375-76 (6th Cir. 2016)).

The petitioner need not obtain a separate COA to challenge discovery rulings that directly relate to an issue on which he did obtain permission to appeal. 28 U.S.C. § 2253(c)(2) requires COAs to issue upon a "substantial showing of the denial of a constitutional right." The COA must identify "which specific issue" satisfies the requirement imposed by § 2253(c)(2). *Id.* at § 2253(c)(3). Put another way, the only specificity requirement for COA concerns identifying which issues implicate a "denial of a constitutional right." Nothing in the statute suggests subsidiary questions—such as the right to obtain discovery to support a particular constitutional claim—need to be the subject of a separate certificate. *See Johnson v. Bauman*, 27 F.4th 384, 391 (6th Cir. 2022) (recognizing "[o]ur obligation to apply statutory text in accordance with its common meaning," particularly in the "federal habeas setting, where Congress has long had primary authority"). This view accords with our sister circuits. *See Buntion v. Lumpkin*, 982 F.3d 945, 952, n.† (5th Cir. 2020) (per curiam) ("'[A] request for an evidentiary hearing stands

or falls with the applicant's COA showing' on the constitutional merits") (citing *United States v. Davis*, 971 F.3d 524, 534 (5th Cir. 2020)); *Cunningham v. United States*, 378 F. App'x 955, 959 n.2 (11th Cir. 2010) (concluding that whether a petitioner is entitled to an evidentiary hearing is a "subsidiary question" of the one included in the COA) (citing *Gomez-Diaz v. United States*,433 F.3d 788, 790, 794 (11th Cir. 2005)); *Jones v. Smith*, 231 F.3d 1227, 1231 (9th Cir. 2000) ("[W]here a district court grants a COA with respect to the merits of a constitutional claim … we will assume that the COA also encompasses any procedural claims that must be addressed on appeal.").

While we possess jurisdiction over Mammone's requests for discovery and an evidentiary hearing, his requests are nonetheless meritless. As the Supreme Court recently recognized, AEDPA "restricts the ability of a federal habeas court to develop and consider new evidence." *Shoop*, 142 S. Ct. at 2043. Specifically, the statute allows the development of new evidence in "two quite limited situations": (1) when the claim relies on a "new" and "previously unavailable" "rule of constitutional law" made retroactive by the Supreme Court, or (2) when the claim relies on a "factual predicate that could not have been previously discovered through the exercise of due diligence." *Id.* at 2044 (quoting 28 U.S.C. § 2254(e)(2)). And even if a prisoner can satisfy either of those exceptions, to obtain an evidentiary hearing, he still must show by "clear and convincing evidence" that "no reasonable factfinder" would have convicted him of the crime charged. *Shinn*, 142 S. Ct. at 1734 (quoting 28 U.S.C. § 2245(e)(2)(A)(i), (ii)). Mammone does not purport to satisfy any of these stringent requirements for obtaining discovery or an evidentiary hearing: he does not rely on a new rule of constitutional law, he does not contend that the factual predicate for his constitutional claims could not have been previously discovered, and he points to no clear and convincing evidence that would cast doubt on the jury's verdict. The district court did not abuse its discretion in denying an evidentiary hearing as to Mammone's ineffective-assistance-of-counsel claims.

## D. Whether appellate counsel was ineffective for not arguing that trial counsel were ineffective.

Mammone claims he was denied effective assistance of counsel when his appellate counsel failed to argue that his trial counsel were ineffective for arguing his mitigation case

under the wrong legal standard. During closing arguments, trial counsel asserted that Dr. Smalldon's testimony about Mammone's mental state constituted a statutory mitigating factor under Ohio Revised Code § 2929.04(B)(3). That provision, however, applies only when the defendant, at the time of committing the offense, lacks the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law because of a mental disease or defect. Ohio Rev. Code § 2929.04(B)(3). The prosecution pointed out that Dr. Smalldon's testimony did not support concluding that Mammone met the provisions of the statute. Mammone contends that by erroneously telling the jurors to consider Dr. Smalldon's testimony under § 2929.04(B)(3), counsel foreclosed the jurors from considering the testimony under § 2929.04(B)(7). Section 2929.04(B)(7) is a catch-all provision that requires the factfinder to consider "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death." Ohio Rev. Code § 2929.04(B)(7).

Mammone raised this claim in his motion to reopen his direct appeal. The Ohio Supreme Court denied it without opinion. The district court concluded Mammone's trial counsel erred by telling the jury to consider Mammone's mental state under § 2929.04(B)(3) but held that Mammone was not prejudiced. It found the aggravating circumstances of the murders and the course-of-conduct evidence was overwhelming, while Mammone's mitigating evidence was "hardly compelling." *Mammone*, 2019 WL 5067866, at *64. The district court noted that because the trial court instructed the jury about the catch-all provision, the jury could have given Mammone's mental state whatever weight it deemed appropriate. It concluded that the Ohio Supreme Court's decision was reasonable because there was not a reasonable probability that the result of Mammone's appeal would have been different if appellate counsel had raised the claim.

The district court properly denied Mammone's claim of ineffective assistance of appellate counsel. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 98–99. Mammone has not presented evidence to overcome this presumption, so AEDPA deference applies to this claim. To establish deficient performance of appellate counsel, Mammone must demonstrate that his appellate counsel's decision not to raise the claim was objectively unreasonable. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 433 (6th

Cir. 2006).  To demonstrate prejudice, he must show that there was a reasonable probability that, but for his counsel's failure to raise the issue on appeal, he would have prevailed.  *Robbins*, 528 U.S. at 285; *Strickland*, 466 U.S. at 694.  A claim of ineffective assistance of appellate counsel has merit only to the extent that the underlying claim has merit.  *See Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008).

Here, the Ohio Supreme Court's denial of Mammone's claim was not unreasonable. Mammone's trial counsel erred by referring to § 2929.04(B)(3), but Mammone cannot show prejudice.  Dr. Smalldon testified that while Mammone acted under extreme emotional distress and had a severe mental disorder, he knew the difference between right and wrong at the time he committed the crimes.  *Mammone*, 13 N.E.3d at 1097.  Mammone's counsel argued to the jury that it could consider two specific mitigating factors: Mammone's lack of a criminal record, *see* § 2929.04(B)(5), and his mental disease or defect, *see* § 2929.04(B)(3).  Counsel referred to Dr. Smalldon's testimony and the fact that Mammone talked calmly to the police after the murders and admitted what he had done.  The prosecutor responded that there was no evidence, including from Dr. Smalldon, that Mammone lacked substantial capacity to appreciate the criminality of his conduct or to conform to the requirements of the law.  The trial court instructed the jurors to consider Mammone's history, character, and background; whether he lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the law because of a mental defect or disease; his lack of a significant history of prior convictions and delinquency adjudications; and any other mitigating factors that weighed in favor of a sentence other than death.  Dr. Smalldon's testimony did not support the § 2929.04(B)(3) mitigating factor, so Mammone's counsel erred in arguing that it did.

However, Mammone cannot show prejudice from trial counsel's error because the jury was free to consider Mammone's mental state under § 2929.04(B)(7), the catch-all provision.  Jurors are presumed to follow the trial court's instructions.  *See Richardson v. Marsh*, 481 U.S. 200, 208 (1987).  Under the trial court's instructions, the jury presumably considered Dr. Smalldon's testimony and other evidence about Mammone's mental health under § 2929.04(B)(7) as relevant to whether Mammone should be sentenced to death.  *See Hill v. Mitchell*, 400 F.3d 308, 325 (6th Cir. 2005) (holding counsel was not ineffective for failing to request an intoxication instruction because the trial court instructed the jury to consider "any other factors that are relevant to the issue of

whether the offender should be sentenced to death"). Mammone cannot show that his trial counsel's reference to language from § 2929.04(B)(3) prevented the jury from considering his mental state under § 2929.04(B)(7).

In addition, there is not a reasonable probability that, had trial counsel not referred to § 2929.04(B)(3), the jury would have sentenced Mammone to life. *See Wiggins*, 539 U.S. at 537; *Strickland*, 466 U.S. at 695. The jury heard about Mammone's difficult childhood, his religious beliefs, his reaction to the breakdown of his marriage, and Dr. Smalldon's diagnosis that he had a severe personality disorder. *Mammone*, 13 N.E.3d at 1093–98. Dr. Smalldon testified that Mammone expressed remorse for killing his former mother-in-law but maintained that killing his children was the right thing to do. *Id.* at 1097–98. As part of its mandatory review of Mammone's death sentence, the Ohio Supreme Court found that his mental state was not entitled to any weight under § 2929.04(B)(3) but gave "modest" weight to the evidence under § 2929.04(B)(7). *Id.* at 1098–1100. The court reasonably held that "the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt." *Id.* at 1100. Likewise, there is not a reasonable probability that, had counsel not invoked § 2929.04(B)(3), the jury would have given such weight to the evidence of Mammone's mental state under § 2929.04(B)(7) that it would have sentenced him to life. Because his underlying claim of ineffective assistance of trial counsel lacks merit, Mammone's claim of ineffective assistance of appellate counsel fails. *See Davie*, 547 F.3d at 312.

## IV. CONCLUSION

For the reasons set forth above, we affirm the district court's denial of a writ of habeas corpus.